[No. G031382. Fourth Dist., Div. Three. May 28, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
EVA CARRILLO, Defendant and Appellant.

**COUNSEL**

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Alana R. Cohen Butler and Sara Gros-Cloren, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—To ensure the fairness of criminal trials, the law provides that evidence of the defendant's poverty is generally inadmissible. In this case, however, the prosecution introduced a considerable amount of evidence showing Eva Carrillo was in difficult financial straits when she allegedly aided and abetted her boyfriend in a robbery. Her poverty was used to provide convincing harmony to the factual melody of the crime. The result was a composition that convinced the jury, but contravened the law. We find this evidence deprived Carrillo of a fair trial and reverse the judgment.

Eva Montero was walking down the street when Edgar Rendon came up to her and yanked a chain and medallion from her neck. Theodore Haas and his wife witnessed the robbery. They followed Rendon in their car as he ran behind a Burger King and into an alley by a strip mall. As Rendon made his way, he looked around as if he were trying to find someone.

Upon driving into the alley, the Haases saw a white van pull up and park behind a purple car. Carrillo was behind the wheel of the purple car, and the people in the van were pointing to her vehicle. She tried to back out around the van, but Mr. Haas positioned his car so as to block her way. He then went up to her car, spotted Rendon in the backseat and opened the front passenger door. Carrillo asked him what was going on, and Mr. Haas told her Rendon had just robbed someone. Rendon then told Carrillo to get going, but she did not do anything. This prompted Rendon to make a run for it. Mr. Haas and the men in the van ran after him.

Carrillo made several more attempts to get her car out, but Ms. Haas edged her vehicle forward, blocking her way. Carrillo told her, "I don't know what's going on[.] I don't even know who that guy is[.] He just jumped in my car and asked me for a ride." When Ms. Haas expressed doubt about this, Carrillo claimed she was waiting for a friend who was in the video store. She then implored Ms. Haas to let her out, saying she was late to pick up her kids in Riverside. However, Ms. Haas refused to move her car.

Moments later, Rendon came running back to Carrillo and told her to get her car out. When Carrillo explained she could not, Rendon kept running. Carrillo then again asked Ms. Haas to let her out. She also repeated her claim she did not know Rendon, but Ms. Haas was now even more dubious. Eventually, Carrillo left her car and walked toward the strip mall. Along the way, she saw Mr. Haas lying on the ground. He was bleeding from the mouth and had been knocked unconscious by Rendon.

Rendon did not get far, though, as the police apprehended him a few blocks from the scene. They arrested Carrillo and placed her in custody with

Rendon. After Rendon and Carrillo kissed, she asked, "What did you do to that old man?" Rendon said, "Fuck, I hit him[.] What was I supposed to do when he tried to hit me?" He also told Carrillo, "Don't worry, baby. I will take the whole rap."

Carrillo testified Rendon is the father of her youngest daughter. She said they had dated for several years and planned to marry. However, at the time of the robbery, she was living with a friend and Rendon did not have a permanent place to live, so he kept many of his belongings in her car.

On the day of the robbery, Rendon paged her and asked her to meet him at the Burger King so he could get some clothes out of her car. When she did not see him at the restaurant, she drove around looking for him. At one point, she went into the alley with the intention of turning around and continuing her search. However, as soon as she pulled into a parking stall, Rendon jumped into her back seat and said, "Let's go." Carrillo was confused by Rendon's actions, but because she was in a hurry, she did not bother to seek an explanation. Rather, she just tried to back her car out. That is when the van pulled up and blocked her way.

According to Carrillo, she had no idea Rendon had committed a robbery and no intention of helping him get away. She was worried about the situation, however, which is why she lied to Ms. Haas. The reason she became so upset is because she was late to pick up her children in Riverside. Once she realized Ms. Haas was not going to let her out, she walked over to Burger King and bought a drink. She then returned to her car and waited there until the police arrived.

One of the officers looked in her trunk, where many of Rendon's clothes were located. Carrillo told the officer about Rendon's page, but she would not let the officer access the messages on her pager. Nor would she provide a name for the person she was with when she received the page.

The defense called several witnesses to corroborate Carrillo's testimony. While cross-examining these witnesses, the prosecutor elicited considerable evidence regarding Carrillo's financial circumstances. Carrillo's sister Zonia admitted Carrillo was not working when they were living together in the months leading up to the robbery. When the prosecutor asked her where Carrillo was getting her rent money, Zonia said, "She was having some checks come in for her daughter." The prosecutor also asked Zonia when Carrillo bought her car and where she got the money to buy it. Zonia did not know the answer to these questions.

In an attempt to rehabilitate Carrillo on the job issue, defense counsel asked Zonia on redirect about Carrillo's employment history. However, the court sustained the prosecutor's objection to this line of questioning on the grounds of relevancy. When defense counsel protested that "the prosecution brought this up in her cross," the court instructed defense counsel to move on, so he did.

Carrillo's other sister, Sally, was next to testify. Over defense objection, the prosecutor peppered her with questions about Carrillo's car. Sally did not know exactly when Carrillo acquired the vehicle, but she surmised it was a couple of months before the robbery.

The prosecutor continued in this vein during her cross-examination of defense witness Catalina Ortiz, with whom Carrillo was living at the time of the robbery. After asking Ortiz about Carrillo's car, the prosecutor got Ortiz to admit that Carrillo was unemployed when they lived together and that Carrillo's share of the rent was $375.

Nor was Carrillo herself immune from questioning in this area. In fact, the prosecutor inquired into her financial situation several times. The following exchange is typical:

"Q. [Rendon] didn't have a job [when you moved in with Ortiz], did he?

"A. No.

"Q. And you didn't have a job during that time period, correct?

"A. No.

"Q. . . . One of the reasons [you moved was so] you could be closer to him, again, correct?

"A. Because we were going to try . . . to get our own place, yes.

"Q. Okay. And so prior to you trying to get your own place, you are going to kind of stay at Catalina Ortiz'?

"A. Just so we both [could] kind of save up to get our own.

"Q. So the two of you were trying to save up money to get your own place?

"A. Well, in the process of getting a job and trying to work at it, that was our goal.

"Q. Because you didn't have money to do it at that time, right?

"A. No, I didn't."

The prosecutor then grilled Carrillo about when she got her car and whether it was registered and insured. The court sustained defense counsel's objections to the registration and insurance questions on the ground of relevancy. Later, the prosecutor asked Carrillo whether she had a job interview on the morning of the robbery. When Carrillo said she actually had a "WIC appointment," the prosecutor asked her, "What is WIC?" Carrillo explained it is a state-run program through which she received infant formula for her daughter.

In closing argument, the prosecutor reminded the jury that Carrillo and Rendon were out of work at the time of the robbery. She also argued that "if you are somebody looking to get something of value so you can get some money, boom, of course, quick, easy, take the chain, guaranteed. Guaranteed value right there. Go to your local pawn store, you get whatever, 50 bucks, whatever it is, 40 bucks."

In the end, the jury convicted Carrillo of robbery and aggravated assault. The court sentenced her to probation and ordered her to serve a year in local custody.

Carrillo contends the prosecutor committed prejudicial misconduct by evoking testimony about her financial situation. The Attorney General does not attempt to justify this evidence. Rather, he argues Carrillo waived her right to challenge it on appeal. He also argues the evidence was not prejudicial. We find the Attorney General's arguments earnest but unavailing.

■ We also take issue with Carrillo's characterization of the issue as one involving prosecutorial misconduct. "Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct." (*People v. Scott* (1997) 15 Cal.4th 1188, 1218 [65 Cal.Rptr.2d 240, 939 P.2d 354].) We can find nothing to suggest the prosecutor intentionally elicited inadmissible evidence in this case—although the long line of decisional law prohibiting such evidence should have given her pause. Rather, she simply elicited as much evidence as the trial court allowed. Under these circumstances, Carrillo's "real argument is that the evidence was inadmissible." (*Ibid.*)

■ To preserve an evidentiary issue for appeal, the complaining party generally is required to make a timely and meaningful objection in the trial court. (Evid. Code, § 353, subd. (a).) The purpose of this rule "is to encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide the defendant with a fair trial." (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060 [120 Cal.Rptr.2d 687].) Thus, an objection will be deemed sufficient so long as it "fairly apprises the trial court of the issue it is being called upon to decide. [Citations.]" (*People v. Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123].) The duty to object will be excused when an "objection or request for admonition would have been futile or would not have cured the [alleged] harm . . . ." (*People v. McDermott* (2002) 28 Cal.4th 946, 1001 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

As the Attorney General correctly notes, defense counsel did not object when the prosecutor first began asking questions about Carrillo's financial circumstances. However, it did not take counsel long to catch the prosecutor's drift and bring it to the trial court's attention. After the initial questioning in this area, defense counsel objected eight different times to this line of inquiry. As noted, some of those objections were sustained, but others were overruled. Thus, the prosecutor was emboldened to keep probing in this area, and the jury ended up hearing a great deal of evidence regarding Carrillo's financial situation. But when defense counsel sought to counter this evidence, the court ordered him to drop the subject. That may explain why he was hesitant to broach the issue at times. He may well have concluded it was too dangerous to risk provoking the trial court's wrath in front of the jury, or he may have figured further objections would only serve to highlight the issue. (See *People v. Hill* (1998) 17 Cal.4th 800, 821 [72 Cal.Rptr.2d 656, 952 P.2d 673] [excusing defense counsel's failure to object for these reasons].) Nevertheless, defense counsel's objections and colloquy with the court made it clear he believed the prosecutor's questions in this area were irrelevant and improper. We therefore proceed to the merits of Carrillo's argument.[1]

■ The law respecting the admission of evidence pertaining to the defendant's poverty is well established. Indeed, for over a century courts have recognized the potential unfairness of admitting such evidence. (See *People v. Kelly* (1901) 132 Cal. 430, 431 [64 P. 563].) In order to avoid that eventuality, the rule has developed that "a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft . . . ."

---

[1] Assuming defense counsel failed to make adequate objections below, we would still review the merits because Carrillo claims any such failing constituted ineffective assistance of counsel. (See *People v. Noguera* (1992) 4 Cal.4th 599, 638–639 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

(*People v. Koontz* (2002) 27 Cal.4th 1041, 1076 [119 Cal.Rptr.2d 859, 46 P.3d 335]; see also *People v. McDermott, supra,* 28 Cal.4th at p. 999.)[2]

While "lack of money is logically connected with a crime involving financial gain . . . [t]he trouble is that it would prove too much against too many." (*State v. Mathis* (1966) 47 N.J. 455 [221 A.2d 529, 538] [reversing murder conviction because, inter alia, the prosecutor introduced evidence that "projected before the jury the forbidden theme that defendant had no apparent means of income and hence was likely to commit a crime for dollar gain"].) As the court explained in *United States v. Mitchell* (9th Cir. 1999) 172 F.3d 1104, "Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value." (*Id.* at pp. 1108–1110 [reversing robbery conviction because the prosecutor introduced evidence of defendant's "impecunious financial circumstances"].)

At bottom, the issue is one of fairness: "It is fundamental to our conception of a fair trial that equality of treatment must be afforded to all without regard to differences in social status or economic condition. In a society which cherishes the ideal of equal justice for all and seeks to accord the equal protection of the laws to all those who are accused of crime, it would be difficult to accept any other view." (*United States ex rel. Mertz v. State of New Jersey* (3rd Cir. 1970) 423 F.2d 537, 541; see also 2 Wigmore, Evidence, § 392, p. 431 (Chadbourn rev. ed. 1979) [practical result of poverty evidence "would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness [such evidence] has seldom been countenanced"].)

As noted above, the Attorney General makes no attempt to justify the evidence pertaining to Carrillo's financial circumstances. However, he maintains it was harmless because the jury already knew Carrillo was not well off. In support of this argument, the Attorney General relies on Carrillo's living situation before the robbery. Based on the fact she lived with her sister Zonia for a few months and then moved in with her friend Ortiz, the Attorney General deduces, "the jury already knew [Carrillo] was not in the best financial situation."

---

[2] Evidence of a defendant's poverty may be "admissible for the limited purpose of refuting a claim that he did not commit the offense because he did not need the money, or to eliminate other possible explanations for sudden wealth after the occurrence of a theft offense. [Citations.]" (*People v. Koontz, supra,* 27 Cal.4th at p. 1076.) But those exceptions do not apply in this case.

The logic of this deduction escapes us. As an unwed mother of two small children, Carrillo may simply have wanted to live with people she could trust to be around her children. Or she might not have liked living alone. Not everyone who has a roommate is teetering over the abyss of bankruptcy. Evidence the jury knew she lived with Zonia and Ortiz before the robbery does not convince us the cat was already out of the bag when the prosecutor started asking pointed questions about her financial situation.

Alternatively, the Attorney General argues that because Carrillo testified on direct examination about her living situation and about being out of work, it does not really matter that the prosecutor raised these issues in her earlier questioning of Zonia, Sally and Ortiz. But we have no way of being sure those questions were not asked *in response* to the prosecutor's line of inquiry. Defense counsel may well have chosen to steer clear of these topics had the prosecutor not raised them in the first place. As a tactical matter, defense counsel may well have felt obliged to have Carrillo address them so the jury could hear her side of the story.

Of course, this gave the prosecutor another chance to raise the money issue on cross-examination. And she took full advantage of this opportunity. Not only did she question Carrillo about her employment status, she also brought out the fact Carrillo and Rendon were too poor to get a place of their own. She questioned Carrillo further about car insurance and registration, thus again reminding the jury of Carrillo's financial obligations.

██ Given all this, we are somewhat puzzled by the Attorney General's characterization of the prosecutor's questioning on the subject of finances as "relatively brief."[3] The fact is, the prosecutor raised the subject with four different defense witnesses, and the sum of the evidence regarding Carrillo's financial situation was considerable. We believe this evidence infringed upon Carrillo's right to a fair trial.

██ Carrillo argues this should require the state to prove the evidence was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) But the erroneous introduction of evidence is typically evaluated under the *Watson* standard. (*People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].) Under that standard, reversal is required only if it is reasonably probable the defendant would have obtained a more favorable result had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

---

[3] Nor are we sure the fact questioning is "relatively brief" carries a lot of weight. If the prosecutor had asked defendant only one question about her membership in Al Qaeda, it would be hard to defend as "relatively brief."

The Attorney General's arguments regarding harmless error, discussed above, strike us as wholly unconvincing. This prosecutor simply left him with no face cards in his hand. The case against Carrillo was entirely circumstantial, and she offered the jury a marginally plausible explanation of events that was consistent with her claim of innocence. Judging by its questions during deliberations, the jury struggled with that explanation. It asked to rehear several witnesses' testimonies and also posed questions about Carrillo's potential liability as an aider and abettor. Among other things, it wanted to know whether "Carrillo need[ed] to have prior knowledge of the necklace robbery to be charged with aiding and abetting."

While arguments based merely upon how long a jury deliberated are almost never persuasive, the questions the jurors ask and the areas in which they focus their deliberations can be revealing. In this case, they indicate the jury concentrated considerable effort upon the central question of whether Carrillo was in on the robbery ahead of time or was presented with a problematic fait accompli when Rendon jumped into her car. This was perhaps not the best defense in the history of criminal law, but it deserved to be considered without regard to Carrillo's penury. Instead, knowing Carrillo was an unemployed, unwed mother on government assistance, the jurors may very well have been inclined to view her as a feckless pauper whose station in life and lack of support for her two children provided her with a motive to steal. Although the prosecutor did not expressly argue this point, she did not have to. The evidence of Carrillo's finances was so extensive, the notion was virtually inescapable.

We are therefore unable to conclude the evidence was harmless, and we cannot allow Carrillo's convictions to stand.[4]

The judgment is reversed.

Aronson, J., and Ikola, J., concurred.

---

[4] In light of this disposition, we need not address Carrillo's other contentions.