Filed 10/15/13  P. v. Galarza CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046827 |
| v. | (Super. Ct. No. 08CF0137) |
| DAMIEN LEONARD GALARZA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

A jury convicted Damien Leonard Galarza of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] and one count of street terrorism (§ 186.22, subd. (a)). In addition, the jury found true two special circumstance allegations—lying in wait (§ 190.2, subd. (a)(15)) and murder to further the activities of a criminal street gang (§ 190.2, subd. (a)(22))—and found true the allegations the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and vicarious discharge by a gang member of a firearm causing death (§ 12022.53, subds. (d) & (e)(1)). The trial court sentenced Galarza to life imprisonment without the possibility of parole for the murder conviction with stayed or imposed concurrent terms for the street terrorism conviction and true findings on the enhancement allegations.

Galarza argues the trial court erred in two ways. First, he argues the court erred by receiving in evidence statements he made during a police interrogation after he allegedly invoked his right to remain silent. Second, he argues the court erred by failing to instruct the jury to consider with caution any statement made by him tending to show his guilt, unless the statement was written or otherwise recorded.

We conclude Galarza did not unambiguously assert his right to remain silent during police questioning and, therefore, the trial court did not err by receiving in evidence statements he made after he allegedly asserted that right. We also conclude any error in failing to give the cautionary instruction was harmless. Accordingly, we affirm.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

---

[1]  Further code references are to the Penal Code unless otherwise indicated.

A. *Juan Orejel Is Killed.*

In the evening of January 3, 2008, Eulises Orejel (Eulises), his brother Juan Orejel (Juan), and three other men walked from the Orejel residence on Anahurst Place in Santa Ana to the Azteca Market, which was less than one block away on the corner of Saint Gertrude Place and Main Street. At that time, Eulises was 16 years old and Juan was two years older. Eulises belonged to a tagging crew called F.T.L. (which stands for "Fuck The Law"). N.W.O. (which stands for "No Way Out") was a rival tagging crew that operated not too far from the Orejel residence.

Eulises, Juan, and the three others walked into the market's rear parking lot from a driveway on Saint Gertrude Place. As they approached the rear entrance to the market, they passed a Chevrolet Suburban that was parked in the rear parking lot. Three men were inside the Suburban. Galarza was in the driver's seat. Juan Calderon was in the front passenger seat, and Rodrigo Sanchez was the third person. A surveillance video showed that Calderon had been inside the market at some point.

Eulises recognized the Suburban. He had seen it earlier that afternoon and on the day before, January 2, 2008, when a heavyset man, who belonged to N.W.O., had driven the Suburban to the Orejel residence and "maddogged" (gave bad looks at) Eulises. Earlier in the afternoon of January 3, Eulises again saw the Suburban with the same heavyset man driving.

Although the heavyset man was not in the Suburban in the evening of January 3, Eulises associated the Suburban with N.W.O. As Eulises walked toward the rear entrance of the market, he heard "a mumble" from the Suburban. He turned and said some "bad words" to the occupants of the Suburban, prompting an exchange of bad words and maddogging, and Eulises "[f]lipp[ed] them off." After this exchange, Eulises and the other four in his group walked into the market, and the Suburban drove away. Eulises thought the incident was "pretty much nothing" and did not "think much about

3

it." He was not concerned because he had had confrontations and fistfights in the past with N.W.O members, and he thought tagging crew members, unlike gang members, do not use weapons.

Juan was angry with Eulises for causing trouble and told his group to leave the market through the front entrance to avoid confrontation in the rear parking lot. Juan and his group walked down Main Street and turned onto Saint Gertrude Place. Eulises saw the Suburban parked at the corner of Saint Gertrude Place and Cypress Avenue. Eulises could not see inside the Suburban, as it was very dark in that area and the Suburban's headlights were not on. To avoid a confrontation, Juan and his group crossed the street to avoid walking past the Suburban, turned left, and headed toward the home of a relation of Juan and Eulises.

At that moment, the Suburban's doors opened and all three occupants got out. They followed Juan and his group, and, drawing close, shouted for them to turn around. Nobody in Juan's group responded. Eulises did not say anything out of respect for his brother's wish to avoid confrontation. Hearing a noise "like a firework" or "a bottle rocket," Eulises turned around and saw Juan on the ground, shot in the head. The three assailants ran back to the Suburban. Eulises did not know which one fired the gun. Juan died from a gunshot wound to the head.

B. *Police Detectives Interrogate Galarza.*

On January 4, 2008, Galarza was interrogated by Santa Ana Police Corporal David Rondou and Detective Flynn at the police station. The interrogation was audio-recorded. The recording was played for the jury, a transcript of the recording was identified as exhibit 14-A, and copies of the transcript were published to the jurors to help them understand the recording.

Rondou asked Galarza questions for a short time before reading him his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Galarza said he

4

understood them. Rondou continued asking Galarza questions and pressed him to give his side of the story. At some point, Galarza made statements, which, he contends, constituted an invocation of his right to remain silent. These statements are explained fully in part I.A. of the Discussion section. The interrogation continued. At a later point in the interrogation, Galarza stated, "I'll talk." Ultimately, Galarza told the police detectives he had driven the Suburban after leaving the Azteca Market, saw the shooting, and identified the shooter as a Delhi member. Galarza admitted he was there to provide backup and "fuck somebody up" if there was a fight.

C. *Expert Testimony*

1. *David Rondou*

Rondou testified as the prosecution's gang expert. He testified that Delhi is a longtime traditional Hispanic street gang and had about 150 members in 2008. Through violence and intimidation, Delhi maintained control over its claimed territory, and enhanced its reputation and the reputation of its members. Juan was killed in an area claimed by Delhi as part of its territory.

Delhi used the number "13" out of honor to the Mexican Mafia. Delhi members wear blue clothing and hats, including a blue Detroit Tigers cap with a "D" on it. Rondou testified that guns are the "lifeline" of a criminal street gang and are "highly prized possession[s]" in the gang world. After speaking with thousands of gang members, Rondou has learned that "[w]hen one gangster has a gun, he's more often than not going to share that with his buddies." Gang members do not commit crimes with people whom they do not trust.

Rondou testified that tagging crews put graffiti on walls and commit some crimes, but do not meet the legal definition of a criminal street gang. He explained that tagging crews might serve as a feeder or pathway to a gang, just as a minor league baseball team serves as a farm team for a major league team. Here, the N.W.O. tagging

crew fed into Delhi, and the F.T.L. tagging crew fed into the Locotes gang, whose claimed territory borders that of Delhi. There are rivalries between tagging crews, and sometimes they have confrontations, but they are not as likely as gangs to use weapons.

In Rondou's opinion, Galarza was a member of Delhi at the time Juan was killed. Rondou's opinion was based on the following:

1. Galarza had been served with a California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.) (STEP) notices twice in November 2007.

2. Once when Galarza was served with a STEP notice, he was in the heart of territory claimed by Delhi and was wearing a blue Detroit Tigers baseball cap with a "D" on it.

3. Galarza's brother was a Delhi member.

4. Galarza had body tattoos which, though not associated specifically with Delhi, were common among gang members.

5. Galarza made statements in a field interview regarding gang affiliation.

6. Galarza had been known to associate with Delhi members.

7. In this case, Galarza was associating with Delhi members and participating in their response to a perceived form of disrespect.

8. Rondou had had "plenty of contacts" with Galarza in the past and "knew he was Delhi." Rondou testified Galarza was "a self-admitted Delhi gang member."

2. *Roland Andrade*

Detective Roland Andrade of the Santa Ana Police Department also testified as gang expert. He had had contact with Galarza several times in the year before Juan's killing and had been present when a STEP notice had been served on him. Andrade believed Galarza was a Delhi member, based on "[t]he totality of the circumstances during my contacts with him, conversations I had with him, his own admissions to me regarding his affiliation and membership with the Delhi criminal street

6

gang, other people I've talked to related to Mr. Galarza who have indicated he's a Delhi gang member."

D. *Defense Evidence*

      1. *Sanchez's Testimony*

        Sanchez testified as a defense witness. He had been charged as a codefendant and pleaded guilty to voluntary manslaughter on the factual basis of aiding and abetting Galarza and Calderon in killing Juan. Sanchez also admitted he committed the offense for the benefit of and in association with Delhi.

        Sanchez testified he was a member of the N.W.O. tagging crew. In 2007, N.W.O. and F.T.L. had been engaged in an ongoing battle over graffiti that sometimes resulted in fistfights. Sanchez was not a member of Delhi, and, according to Sanchez, one could not be a member of both N.W.O. and Delhi. Sanchez had heard that Calderon was a member of Delhi and a former member of N.W.O. Sanchez knew that Galarza was a member of N.W.O. and was not a member of Delhi.

        In the evening of January 3, 2008, Sanchez was at a friend's house when Galarza, driving a white Suburban, arrived. Calderon also was in the Suburban. Sanchez agreed to go with Galarza and Calderon to the Azteca Market to buy cigarette tobacco. Galarza drove to the rear parking lot of the Azteca Market. As Calderon got out of the car to go inside the market, he reached into his pants, pulled out a gun, and placed it on the backseat. Sanchez had not known Calderon to carry a gun and did not tell Galarza about it.

        Calderon returned from the market, and as he, Sanchez, and Galarza sat in the Suburban, a couple of guys walked through the parking lot. They looked at Sanchez, who asked if "they did graffiti." In response, the guys said they were "graffiti artists" from F.T.L., and walked into the market. Sanchez interpreted their response as a challenge and said, "let's get in a fight with these guys." Calderon, who had returned

7

from the market, Sanchez, and Galarza discussed the situation. Sanchez was angry. Calderon handed him the gun. Sanchez handed it back and said he "didn't want any part of this."

Galarza drove the Suburban out of the parking lot and parked just south of the intersection of Saint Gertrude Place and Cypress Avenue. Calderon rolled marijuana. Sanchez told Galarza he wanted to wait for the guys from F.T.L. and fight them. About 10 minutes later, Sanchez saw the guys from F.T.L. walking down Saint Gertrude Place and starting to cross Cypress Avenue. Sanchez and Galarza simultaneously got out of the Suburban. Galarza told Calderon to stay inside the Suburban.

When Sanchez and Galarza were about 30 feet behind the F.T.L. guys, Sanchez asked them, "you guys write?" Sanchez meant this as a challenge, and such a question is the typical way in which a confrontation between tagging crews begins. The F.T.L. guys did not respond, which indicated they did not want to fight or have any problems, so Sanchez and Galarza stopped pursuing them.

Out of the corner of his eye, Sanchez saw Calderon with his gun drawn. Sanchez heard a gunshot. Shocked and scared, Sanchez ran back to the Suburban. Galarza drove the Suburban to his friend's house, and Sanchez eventually drove Galarza home. Sanchez was arrested about 3:00 a.m. on January 4, 2008.

2. *Galarza's Testimony*

Galarza testified in his own defense. He was 20 years old at the time of the shooting. He had grown up within the area claimed by Delhi as part of its territory, and had known Delhi members, including his older brother. Galarza was not a member of Delhi, and his brother had told him not to join because it was not a lifestyle he would want.

Galarza, as Sanchez, was a member of the N.W.O. tagging crew, which Galarza nicely described as "a bunch of gentlemen that deface people's property."

8

Galarza had been a member of N.W.O since he was about 12 years old and was a member at the time of his arrest. F.T.L. was a rival tagging crew, and F.T.L. and N.W.O. would have fistfights when encountering each other. Neither Galarza nor other N.W.O. tagging crew members ever carried or used a weapon.

At the time of the shooting, Galarza had known Calderon only a few months and did not consider him a friend, although the two had smoked marijuana together. Calderon was a member of N.W.O. when Galarza first met him. Three to four weeks before Juan was killed, Calderon became a Delhi member.

Galarza's version of the shooting was substantially the same as Sanchez's. Galarza testified that while parked in the Azteca Market parking lot, Eulises and Sanchez glared at each other, and Eulises told Sanchez, "fuck you." When Sanchez asked where they were from, a few turned around and said, "F.T.L." Before leaving the parking lot, Galarza saw Calderon hand Sanchez a gun and heard Sanchez say, "should I shoot these fools?" Calderon replied, "you don't have to if you don't want to."

Galarza drove the Suburban out of the parking lot and parked near a stop sign at the intersection of Saint Gertrude Place and Cypress Avenue so that Calderon could roll a blunt. When the F.T.L. guys were spotted, Galarza agreed to get out of the Suburban with Sanchez. Galarza thought there would be a fistfight and told Calderon to stay in the car. Galarza and Sanchez followed the F.T.L. guys and told them to turn around. When none did so, Galarza and Sanchez turned to go back to the Suburban. Galarza was surprised to see Calderon, who pulled out his gun and aimed it at the F.T.L. guys. Galarza told him to "kick it," meaning to stop, but Calderon fired the gun once.

Galarza, hearing a groan, ran back to the Suburban with Sanchez and Calderon. Galarza dropped off Calderon, and then Sanchez drove Galarza home.

Galarza was interrogated the next day by Santa Ana police detectives. Galarza testified he lied to the detectives throughout the interrogation and told them different stories "to kind of wiggle my way out of the situation." He lied because he was

afraid of going to jail and being labeled a "rat," but "reality" hit when Galarza realized the detectives knew he had been at the crime scene. He began to give "bits and pieces of the truth, but not the full truth" and, by the end of the interrogation, he was telling a mixture of lies and truth. Galarza told the detectives he was a Delhi member, although that was a lie, because that was "what [they] wanted to hear at the same time" and he "wanted to make it seem like I was being honest."

Galarza testified he owned and wore a Detroit Tigers baseball cap with a "D" on it. He knew the letter "D" was a Delhi logo, but he wore that cap because his first name is Damien and a friend sold him the cap for half price. Galarza was not concerned about wearing a cap with a Delhi logo because he always wore the cap backwards and did not wear it to signal gang membership.

## DISCUSSION

## I.

### The Trial Court Did Not Err by Receiving in Evidence All of Galarza's Statements Made During the Police Interrogation.

A. *Background*

Galarza argues the trial court erred by concluding he did not invoke his right to remain silent during the police interrogation and by receiving in evidence all of his statements made during the interrogation. To address that argument, we start by reviewing relevant portions of the transcript of the police interrogation on January 4, 2008.

Galarza was interrogated by Rondou and Flynn. Before being read his *Miranda* rights, Galarza was asked about his body tattoos. He answered questions about where he grew up and where he currently lived. Galarza said a police officer named Hernandez was "crooked" and had told him he was going to "put you and your brother

10

away for as long as I can." When Galarza asked, "what's going on," Rondou replied, "[y]ou[r] name popped up in an incident we're looking into."

At that point, Rondou read Galarza his rights under *Miranda*, and Galarza said he understood them. Rondou continued asking Galarza questions and pressed him to give his side of the story. Galarza acknowledged he had been in the Suburban the previous day but said he did not want to be a rat. Rondou told Galarza, "I know who you were with. I know where you were. There's still some doubt on what you[r] role was here." Galarza claimed he did not know what Rondou was talking about and said he "didn't do nothing." Galarza denied he was a member of Delhi and denied he had been at the Azteca Market on the evening of January 3, 2008.

Rondou told Galarza, "I got the feeling you're gonna to let these dudes put the case on you." Galarza replied, "[h]ell no" and he did not want to feel like a "fucking rat." Rondou continued to press Galarza to give his side of the story, and Galarza continued to maintain he did nothing, did not know what happened, and "wasn't there." Rondou insisted Galarza had been at the crime scene, and Galarza insisted he had been telling the truth.

After these back-and-forth exchanges, this colloquy occurred:

"[Galarza]: I didn't do a shit, homey. You tell him that, homey . . . . I didn't do a shit, homey. I'll tell you, you know what, fucking to the bus stop, that's all. I'm done, man. I'm done, man. I got nothing else to say.

"RO[N]DOU: You won't talk to us anymore?

"[Galarza]: . . . I'm done. . . . I got nothing to say, homey. I'm—, that's it.

"RO[N]DOU: Okay.

"[Galarza]: I'm tired, I'm sick, homey. I'm . . .

"RO[N]DOU: You're even more tired than me, man. [¶] . . . [¶]

"[Galarza]: You guys are fucking down, man.

"RO[N]DOU: No, we're—, we're good.

11

"[Galarza]:  You guys are down. . . . I mean, . . . I smoke the whole hours and go to sleep the same day.  Well yeah, that's it.  I'm—, I'm done, . . . .

"RO[N]DOU:  You don't want to talk to us anymore?

"[Galarza]:  No, I'm through, man.

"RO[N]DOU:  You don't like us?

"[Galarza]:  Nuh, you guys are cool people.  I knew, but . . .

"RO[N]DOU:  Then talk to us.

"[Galarza]:  Because . . . you guys are getting on my nerves, I mean . . .

"RO[N]DOU:  The feeling's mutual, my friend.

"[Galarza]:  I tell you guys the truth, you guys don't believe me.

"RO[N]DOU:  You told us the truth of what happen [*sic*] as you pulled out . . . [¶] . . . [¶] . . . but from where you went as soon as you pulled out, that's—, that's . . . [¶] . . . [¶]

"[Galarza]:  That's—, that's the truth, that's all I got to say.  Like I show you, I went down Orange, made a left . . .

"RO[N]DOU:  You don't want to talk to us anymore, or do you wanna?

"[Galarza]:  I don't want to, you know.

"RO[N]DOU:  Okay.

"[Galarza]:  I'm cool.  I'm done.

"RO[N]DOU:  You're done.

"[Galarza]:  I'm . . . ."

At that point, Rondou told Galarza he was going to jail for murder and asked Galarza if he wanted to talk.  The following discussion then occurred:

"RO[N]DOU:  You're going to jail.  You're going to jail for murder, man.  Put your hand in there.

"[Galarza]:  Are you serious?

"RO[N]DOU:  Put your hand in there.

12

"[Galarza]:  Why big dog[?]

"RO[N]DOU:  You want to talk to me, I'll spend all night talking . . .

"[Galarza]:  I'll talk . . .

"RO[N]DOU:  You wan[t] to talk to us?

"[Galarza]:  Yeah, but I—, I—, homey, I don't want to go to jail for murder dog."

Galarza again asserted he had told Rondou the truth.  Rondou said, "[n]o, it's not.  I told you we know what happened and I'm not playing games.  You said you want to talk to us, I'll sit and listen.  I'll listen to you all night and I know we shucked and jived and joke around but it's no joke."  Rondou again asked Galarza to tell his side of the story, Galarza again insisted he did not do anything, and Rondou again insisted Galarza had not told the truth.

The interrogation continued.  Galarza continued to claim he knew nothing about the shooting and had not been lying.  He said he was tired and wanted to go home.  Flynn stated, "[w]e got people, pointing the finger at you saying you were there and you did it . . . ."

Galarza then said he was in the Suburban in the evening of January 3, 2008, and was seated behind the driver, identified as "Gabriel."  The car stopped, Galarza got out because he did not want to "roll the blunts" with the others, and he walked toward the bus stop.  As he passed a tire store on Main Street, he heard a single gunshot.  He then caught a bus to go home.  Rondou told Galarza he was "a terrible liar" and told him to "stop from jerking around and tell the truth."

Galarza said he got out of the Suburban because the others in the Suburban wanted to "fuck these fools up" (referring to Eulises, Juan, and the three others in their group) and he wanted no part of it.  Galarza claimed he was the only one who got out of the Suburban.  At first he claimed he did not know why the others in the Suburban wanted to attack Eulises and Juan, but then said they had looked at somebody in the

13

Suburban. Galarza stated, "someone in the car shot him, that's all I know" and claimed he did not know that anyone in the Suburban had a gun. Galarza said he got out of the Suburban, walked to the west side of Cypress Avenue, and smoked a cigarette. Galarza said two others (later identified as Calderon and Sanchez) got out of the Suburban and walked across the street, while Gabriel, the driver, stayed inside. Calderon and Sanchez approached two guys in the street. Galarza heard one gunshot. Calderon and Sanchez ran back to the Suburban and got inside. Galarza claimed he did not get back into the Suburban, but ran off.

Galarza later admitted he saw the shooting and the shooter was a Delhi member. Galarza said he knew Calderon was a Delhi member but did not know whether Sanchez was. Galarza denied being a Delhi member, but stated he had "back[ed] it up" for about a year. Galarza later said he was "from" Delhi ("I'm fucking DELHI, homey") and was with Calderon and Sanchez to provide backup and "fuck somebody up" if there was a fight. At the end of the interrogation, Galarza stated that Gabriel had been in the Suburban at the Azteca Market, but was dropped off before the shooting. Galarza admitted he was driving when the Suburban left the market. He denied being the shooter but, after seeing the shooting, left the keys in the Suburban and "fucking bounce[d]."

B. *Galarza's Motion and the Trial Court's Ruling*

At the outset of trial, Galarza brought a motion under Evidence Code sections 402 and 403 to exclude statements he made to law enforcement, including, and most importantly, statements he made during the police interrogation, on the ground those statements were made in violation of his Fifth Amendment rights. The motion asserted Galarza's statements before the *Miranda* warning was given were made in violation of *Miranda* and Galarza's statements made after the *Miranda* warning was given should be suppressed as the product of coercion.

14

In court, Galarza's counsel submitted an audio recording and transcript of the entire police interrogation (exhibits 1 and 1-A). Redacted from those exhibits were passages from the interrogation that likely would have been excluded under Evidence Code section 352. Galarza's counsel also submitted, as exhibit 2, an audio recording of the interrogation without redactions. A transcript of exhibit 2 was marked as exhibit 2-A. At the request of Galarza's counsel, the court agreed to listen to exhibit 2 up to the point when Galarza was read his rights under *Miranda*.

Two days later, the trial court announced it had listened to exhibits 1 and 2 and had read exhibits 1-A and 2-A. Galarza's counsel argued Galarza should have been given a *Miranda* warning at the outset of the interrogation, before giving the *Miranda* warning, Rondou and Flynn had engaged in a deliberate tactic of getting Galarza to become comfortable and open up, and, therefore, the entire interrogation was unconstitutionally coercive. The prosecutor stated he "wouldn't object" to excluding the few minutes of the interrogation that preceded the *Miranda* warning.

The trial court on its own initiative considered whether Galarza had invoked his Fifth Amendment right to silence during the police interrogation. The court noted that Galarza did not raise the issue but, on the record, reviewed the portions of the interrogation in which Galarza stated he was "done," was through, and had "nothing else to say." The court construed these passages as an expression of frustration with the detectives' refusal to accept Galarza's story. The court stated: "[R]eading these passages, because it appears that the defendant's mentality is he doesn't want to rat on anybody else and that's extremely important to him because he says in here in no uncertain terms that if he rats he could be killed or harmed or however that language goes. [¶] There's at least one other passage where the defendant says 'I'm done' or says maybe I don't want to say anything else or something to that effect. So I looked at that in the totality of the circumstances, voluntariness and otherwise, and my interpretation of that was this is the defendant saying, if you're not going to believe what I have to say,

15

what else can I say?  I have nothing else to say.  I do not interpret that to be an invocation of the right to remain silent."

The trial court found that Galarza's statements—both before and after the *Miranda* warning—were made voluntarily.  Out of "an abundance of caution," the court excluded Galarza's statements made before the *Miranda* warning.  Galarza's counsel then asked that, in light of the court's ruling, the court allow in all of Galarza's statements made during the interrogation.  The court agreed and stated, "your objection is preserved."[2]

C. *No Forfeiture*

The Attorney General argues that Galarza forfeited his claim that he invoked his right to remain silent during the police interrogation by failing to raise that claim in the trial court.  Although Galarza did not argue he had invoked his Fifth Amendment rights during the interrogation, we conclude the issue may be raised directly on appeal.  "To preserve an evidentiary issue for appeal, the complaining party generally is required to make a timely and meaningful objection in the trial court.  [Citation.]  The purpose of this rule 'is to encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide the defendant with a fair trial.'  [Citation.]  Thus, an objection will be deemed sufficient so long as it 'fairly apprises the trial court of the issue it is being called upon to decide.  [Citations.]'  [Citation.]  The duty to object will be excused when an 'objection or request for admonition would have been futile or would not have cured the [alleged] harm . . . .'  [Citation.]"  (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.)

Here, the purpose of the rule requiring an objection was fulfilled because the trial court addressed the issue whether Galarza invoked his Fifth Amendment rights

---

[2]  The court stated:  "[Y]our agreement is also in the record that in light of my ruling—and only in light of my ruling—are you requesting that the first few pages go in."

16

and therefore could "'correct or avoid'" any error and "'provide [Galarza] with a fair trial.'" (*People v. Carrillo*, *supra*, 119 Cal.App.4th at p. 101.) The trial court listened to the audio recording, read the transcript of the police interrogation, reviewed the relevant passages on the record, and explained the reasons for its ruling. Thus, a formal objection likely would not have assisted the trial court or led it to alter its ruling.

D. *Galarza Did Not Unambiguously Invoke His Right to Remain Silent.*

    1. *Relevant Law*

        "The admission at trial of a defendant's statements made involuntarily to government officials violates the defendant's federal due process rights under the Fifth and Fourteenth Amendments. [Citation.] Similarly, a defendant must be advised of his or her *Miranda* rights, and must make a valid waiver of these rights, before questioning begins or any statements resulting from interrogation can be admitted. [Citations.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 114, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) If the defendant knowingly and intelligently waives those rights, law enforcement officers may question, but if the defendant invokes his or her right to remain silent at any point in the interrogation, then questioning must cease. (*People v. Martinez* (2010) 47 Cal.4th 911, 947.)

        "Even if a defendant voluntarily has waived his or her *Miranda* rights to remain silent and to have counsel present, the defendant later may revoke the waiver. In such a case, 'once a defendant has indicated an intent to assert his right to remain silent or to counsel, all further attempts at police interrogation should cease.' [Citation.] 'In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to silence or counsel. [Citation.] It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under

17

*Miranda*, *supra*, 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether. [Citation.]' [Citation.] A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning. [Citations.]" (*People v. Rundle*, *supra*, 43 Cal.4th at pp. 114-115.)

"On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary [citation], whether his *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and '"accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence."' [Citations.]" (*People v. Rundle*, *supra*, 43 Cal.4th at p. 115.)

2. *Analysis*

Viewing Galarza's statements in context, we conclude Galarza did not unambiguously assert his right to remain silent. Galarza initially waived his *Miranda* rights, and spoke with Rondou and Flynn. Galarza claimed he was not a Delhi member and was not at the crime scene. Rondou said he did not believe Galarza and pressed him to tell his side of the story. After stating several times he had been telling the truth, Galarza declared, "I didn't do a shit, homey," and stated, "I'm done" and "I got nothing else to say." Galarza said he did not want to talk because "you guys are getting on my nerves" and "I tell you guys the truth, you guys don't believe me." By stating he was done talking, a reasonable inference could be drawn that Galarza was expressing his frustration and anger over the detectives' refusal to buy into his story.

The trial court, which listened to an audio recording of Galarza's interrogation and read the transcript, could reasonably conclude, as it did, that Galarza was expressing frustration and anger with the detectives for not believing him. "While we must review the record and make an independent determination of the question, we, like the United States Supreme Court, may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People v. Jennings* (1988) 46 Cal.3d 963, 979 (*Jennings*).) We accept the trial court's inference, reasonably drawn from the audio recording and transcript of the interrogation, that Galarza's statements that "I'm done" and "I got nothing else to say" were expressions of frustration and animosity, not unambiguous invocations of the right to remain silent.

An analogous case is *Jennings*, *supra*, 46 Cal.3d 963. In that case, the defendant made incriminating statements to police officers Cromwell, Maich, and Rose, in an interrogation following the discovery of the murder victim's body. (*Id.* at pp. 974, 978.) The defendant claimed he invoked his right to remain silent during that interrogation, by stating to Officer Cromwell: "'I'll tell you something right now. You're scaring the living shit out of me. I'm not going to talk. You have got the shit scared out of me,' and, 'I'm not saying shit to you no more, man. You, nothing personal man, but I don't like you. You're scaring the living shit out of me. . . . That's it. I shut up.'" (*Id.* at p. 977.)

The California Supreme Court, upholding the trial court's ruling, concluded the defendant did not invoke his right to remain silent by making the above quoted remarks to Officer Cromwell. (*Jennings*, *supra*, 46 Cal.3d at p. 978.) Assuming the defendant had been in custody during the interrogation, the Supreme Court also agreed with the trial court that the defendant did not intend to invoke his right against self-incrimination. (*Ibid.*) The court did not consider the defendant's statements in isolation, but as part of the interrogation as a whole. (*Ibid.*) During the interrogation, Officer Cromwell questioned discrepancies in the defendant's story and was persistent in

19

attempting to get the defendant to clarify contradictory statements. (*Ibid.*) The defendant became angry and refused to say anything more. (*Ibid.*) The Supreme Court concluded: "Viewing the tape, observing defendant's demeanor before, during, and after the statements, and considering the context in which defendant made the statements on which he relies here, we conclude that the statements reflect only momentary frustration and animosity toward Cromwell." (*Ibid.*)

Other cases, though not as analogous as *Jennings*, lend support to our conclusion Galarza did not unambiguously invoke his right to remain silent. (See *People v. Martinez*, *supra*, 47 Cal.4th at pp. 949-951 [the defendant did not invoke right to remain silent by stating "'That's all I can tell you'" and "'I don't want to talk anymore right now'"]; *In re Joe R.* (1980) 27 Cal.3d 496, 516 [when suspect who had given exculpatory statements was emphatically accused of lying by interrogating officers, the response "'That's all I have to say'" was interpreted to mean "That's my story, and I'll stick with it," rather than a request to terminate the interview]; see also *People v. Williams* (2010) 49 Cal.4th 405, 433 [no unambiguous invocation where, near end of lengthy interview, suspect responded to police officer's disbelief of his denials by stating, "'*I don't want to talk about it*'"]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1211 [no unambiguous invocation where suspect stated, "'I don't have a side of the story'" and "'I don't want to talk about it'"].)

Further, Galarza reinitiated the conversation with Rondou and Flynn. After a suspect invokes a Fifth Amendment right, further questioning is forbidden unless the suspect personally initiates further communications, exchanges, or conversations. (*People v. Gamache* (2010) 48 Cal.4th 347, 384.) A suspect personally initiates further communications, exchanges, or conversations when he or she speaks or engages in conduct that can be fairly said to represent a desire to open a more generalized discussion relating directly or indirectly to the investigation. (*Id.* at pp. 384-385.) The prosecution has the burden of proving the suspect initiated further discussions with the police and the

20

suspect knowingly and intelligently waived the right previously invoked. (*Id.* at p. 385.) The question whether the suspect or the police reinitiated communication, after the suspect's invocation of Fifth Amendment rights, is predominately factual and therefore reviewed under the substantial evidence standard. (*Ibid.*)

After Galarza stated he was done talking, Rondou asked him, "[y]ou don't want to talk to us anymore, or do you wanna?" Galarza replied, "I'm done." At that moment, questioning ceased. Rondou placed Galarza under arrest for murder. Rondou had made no prior threats to do so. When Galarza expressed surprise at being placed under arrest, Rondou stated, "[y]ou want to talk to me, I'll spend all night talking." Galarza then reinitiated the conversation by stating, "I'll talk." Rondou confirmed, "[y]ou wanna . . . talk to us?" Galarza replied, "[y]eah, but I—, I—, homey, I don't want to go to jail for murder dog."

Galarza argues that Rondou reinitiated the conversation by asking if Galarza wanted to talk. Viewing all the statements in context, we conclude Galarza reinitiated the conversation in response to being placed under arrest. Galarza's reaction to being arrested ("[a]re you serious" and "[w]hy big dog") and his unambiguous statement "I'll talk" constituted words and conduct that """can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.'""" (*People v. Gamache*, *supra*, 48 Cal.4th at pp. 384-385.) The transcript of the interrogation permits the fair inference that Galarza's waiver of his right to remain silent and restarting of communication were knowingly and intelligently made.

**II.**

**Any Error in Failing to Give the Cautionary Jury
Instruction Was Harmless.**

Galarza argues the trial court erred by failing to instruct sua sponte that his unrecorded oral admissions should be viewed with caution. Such instruction was

21

required, Galarza argues, because Rondou testified Galarza was a "self-admitted" Delhi member and Andrade testified he believed Galarza was a Delhi member based on "his own admissions to me regarding his affiliation and membership with the Delhi criminal street gang." We conclude any error was harmless.

CALCRIM No. 358 reads as follows: "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

Here, the trial court gave the first paragraph of CALCRIM No. 358 (with modifications), but did not give the second paragraph admonishing the jury to consider with caution any unwritten or unrecorded statement made by the defendant.

"When the evidence warrants, the court must instruct the jury sua sponte to view evidence of a defendant's oral admissions or confession with suspicion." (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) The trial court erred by not giving the cautionary instruction because evidence was presented that Galarza orally admitted to Rondou and Galarza he was a Delhi member. The Attorney General does not argue otherwise.

"The standard of review for erroneous failure to give the cautionary instruction is . . . the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given." (*People v. Dickey*, *supra*, 35 Cal.4th at p. 905.) Galarza argues the error in failing to give the cautionary instruction violated his federal constitutional rights and, therefore, the more stringent *Chapman v. California* (1967) 386 U.S. 18 standard should apply. The California Supreme Court has rejected this argument

22

at least twice.  (*People v. Dickey*, *supra*, at p. 905; *People v. Carpenter* (1997) 15 Cal.4th 312, 393.)

"'"The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made." [Citation.]' [Citation.] 'Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]' [Citation.]" (*People v. Dickey*, *supra*, 35 Cal.4th at p. 905; *People v. Carpenter*, *supra*, 15 Cal.4th at p. 393.)

Thus, in assessing prejudice, we address whether there was any conflict in the evidence about the exact words used in the purported admissions and whether the witnesses repeated the admissions accurately.  The admissions were (1) Rondou testified Galarza was a "self-admitted" Delhi gang member and (2) Andrade testified he believed Galarza was a Delhi gang member based on "his own admissions to me regarding his affiliation and membership with the Delhi criminal street gang."  There is no conflict in the evidence about what Galarza said to Rondou and Andrade.  Although Galarza testified he was not a Delhi gang member, he never denied making those admissions to Rondou and Andrade.  Galarza did not deny being served with a STEP notice in Andrade's presence.  In sum, there was no prejudice because "[t]here was 'no evidence that the statement was not made, was fabricated, or was inaccurately remembered or reported.'" (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 393.)  In addition, the trial court instructed the jury on judging the credibility of witnesses.  (*Ibid.*)

Because the only error we have found was that in failing to give the cautionary instruction, there was no cumulative error.

23

**DISPOSITION**

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.