Filed 11/8/21  P. v. Silva CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E069863 |
| v. | (Super. Ct. No. FVI1500835) |
| DOMENIC DELANO SILVA, Jr., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Tomberlin, Judge.  Affirmed in part, reversed in part with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

A jury convicted defendant and appellant, Domenic Delano Silva, Jr., of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the special allegation that he personally and intentionally discharged a firearm, which resulted in the victim's death (§ 12022.53, subd. (d)).  The trial court sentenced defendant to consecutive terms of 25 years to life in prison for the murder and 25 years to life in prison for the special allegation.

On appeal, defendant argues:  (1) the trial court erred by admitting a rap video featuring him; (2) the trial court erroneously allowed the prosecution to ask a police detective about whether defendant was a gang member; (3) the trial court failed to give a limiting instruction to the jury; (4) substantial evidence does not support his conviction; (5) the trial court erroneously instructed the jury on eye witness credibility with CALCRIM No. 315; (6) these errors cumulatively require reversal; and (7) his trial counsel was ineffective.  Defendant also argues the matter must be remanded for various sentencing issues.

In a previous opinion, we affirmed defendant's convictions but remanded the matter for resentencing.  In doing so, we held that the trial court did not err by instructing the jury with CALCRIM No. 315.  After that opinion was filed, our Supreme Court granted review and deferred the matter pending its decision in *People v. Lemcke* (2021)

---

[1]  Unless otherwise indicated, all statutory references are to the Penal Code.

2

11 Cal.5th 644 (*Lemcke*), which "acknowledged the current version of [CALCRIM No. 315] might confuse jurors about the relationship between confidence and accuracy" of an identification. (*Id.* at p. 666.) The court then transferred the matter back to this court with directions to vacate our initial opinion and reconsider the cause in light of *Lemcke*. After considering supplemental briefs on *Lemcke* from the parties, we conclude CALCRIM No. 315 did not violate defendant's state or federal due process rights and did not prejudice him.

The People agree with defendant that a remand is appropriate as to the resentencing matters, as do we. We thus reverse defendant's sentence and remand for resentencing. We agree the trial court erred by admitting the rap video, but conclude the error was harmless. We reject defendant's remaining contentions, and otherwise affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2014, police responded to a reported burglary at defendant's residence. Defendant reported that when he had returned home the night before, he noticed his PlayStation and about $1,000 in cash were missing. Defendant gave the officers the PlayStation's serial number, and did not contact the police again.

About seven months later, Emmitt Burns was shot and killed. The backpack he was wearing contained a PlayStation. Its serial number matched the serial number of defendant's missing PlayStation.

3

About 10 minutes after police were dispatched to respond to the shooting, defendant was pulled over by a California Highway Patrol (CHP) officer for speeding about a mile away from where Burns was shot. Defendant was alone and told the officer he was heading to pick up his girlfriend, who was getting off of work.

The morning after the shooting, Detective Sergeant Andrew Espinoza interviewed M.F., who lived on the second floor of a building near the crime scene. M.F. told Detective Espinoza that she was standing on her balcony, which "provided a clear view" of the crime scene, when she heard several shots. She called 911 and then went downstairs, where she found Burns lying in the street. Detective Espinoza noted the vantage point from M.F.'s balcony and asked her if she looked at the area where the shots came from. M.F. hesitated and said, "I went inside to check on my son."

During her interview, M.F. "was looking around at everybody in the area." Detective Espinoza asked her again whether she looked at the area where the shots came from after they were fired, but she appeared to be "more concerned about who was walking around" the crime scene investigation. Detective Espinoza thought M.F. "was holding back information" and that "she had possibly seen something regarding th[e] shooting," so he stopped questioning her and assigned detectives to come back and talk with her later.

On the same day while investigating an unrelated matter, Detective Espinoza encountered defendant. When defendant was near the investigating officers, he looked up and saw them, but stopped in the middle of the street and stared at them, so Detective

4

Espinoza approached him. They recognized each other from previous contacts. Defendant reminded Detective Espinoza of his name, and they briefly engaged in small talk.

Detective Espinoza told defendant that he was investigating "'the incident that happened last night,'" and asked defendant if he had heard about it. Defendant did not respond, but instead stared off without making eye contact. After about five seconds of silence, Detective Espinoza again asked defendant whether he knew anything about the shooting, and defendant responded by saying, "'I know it's gang related.'" Detective Espinoza was not surprised to learn that the shooting was gang-related because he knew Burns associated with a gang, but he was surprised that defendant acknowledged knowing about the incident. When asked how he knew the shooting was gang-related, defendant did not answer and again stared off without making eye contact. Defendant then said something along the lines of, "'I knew Emmitt Burns. We used to play basketball when we were kids.'" Detective Espinoza again asked defendant how he knew the shooting was gang-related, but they were distracted by the sound of a car's door slamming shut and additional officers arriving. Defendant then said he had to go pick up a family member and left the scene of the incident.

The next day, Detective Reyes went back to M.F.'s apartment and conducted an audiotaped interview. When Detective Reyes told M.F. that he was investigating Burns's murder, M.F. began crying and said she witnessed the entire incident while standing on her balcony. M.F. said she was on her balcony smoking a cigarette with her friend when

5

she saw Burns walking in the street. She had never met him, but she was an acquaintance of his sister. A silver Honda with tinted windows drove past Burns and pulled into M.F.'s apartment complex parking lot "really fast." The passenger exited the car, approached Burns, and started shooting at him repeatedly without saying anything. M.F. described the shooter as a light-skinned Hispanic male, average build, with a short faded haircut, and about 22 years old. He was wearing a big, mostly blue Letterman-style jacket with red and white stripes, and blue, faded washed or blue with white style jeans. She had never seen him before, but thought she would be able to identify him if she saw him again.

The next day, the police conducted a videotaped interview of M.F. Detective Reyes went over M.F.'s statement in more detail because he did not think she was comfortable talking about the incident the day before. M.F. confirmed what she had previously told Detective Reyes, and added additional details, including that the shooter was "probably" wearing black "Jordan" shoes, and that she thought the gun was a 9-millimeter.

M.F. then met with a sketch artist, who asked her several questions about the shooter's appearance. According to Detective Espinoza, the description of the shooter M.F. provided matched defendant's appearance from Detective Espinoza's encounter with him the day before. Upon seeing the completed sketch, M.F. began crying and said it looked like the man who shot Burns.

A few days later, M.F. was shown a live lineup and two six-pack photographic lineups. M.F. confirmed that the person in the live lineup was not the shooter. Defendant's photograph was in the first six-pack, but M.F. said that someone else looked like the shooter. She did not select any photographs from the second six-pack, which did not have a photograph of defendant. She later informed the police that the photograph she had selected in the first six-pack was not the shooter.

About a week later, M.F. met with Detective Reyes again. M.F. informed Detective Reyes that Burns's brother had contacted her on Facebook and sent her photographs of several people, including defendant, and that she recognized defendant as the shooter. Burns's brother had given the police a picture of defendant, which Detective Reyes showed M.F. Upon seeing the photograph, M.F. said that it was the person who shot Burns. Detective Reyes asked M.F. about the person she had previously identified in the first six-pack lineup. M.F. confirmed that that individual was not the shooter and that "there was no doubt in her mind" that defendant was the shooter.

Two weeks after Burns's murder, Detectives Leo Griego and Reyes spoke to defendant at his home, which is near where Burns was shot. Defendant confirmed that he owned a Honda Accord. When asked where he was on the night of the murder, he said he was at home with his girlfriend. He said he did not hear the shooting and did not know anything about it other than seeing police arriving. Defendant then "spontaneously" told the detectives that he had received a speeding ticket on the night of Burns's murder. He stated that he was picking up cough syrup for his grandmother and

7

that he had lied to the officer who pulled him over that he was picking up his girlfriend from work.

When asked about his PlayStation, defendant said that he knew that R.C. had stolen it. He said he was not mad about it anymore because R.C.'s brother paid him back for it. However, R.C. and his brother denied knowing anything about defendant's PlayStation or paying him any money for it.

C.L. owned the same gun as defendant and fixed defendant's gun when it had a problem. About two months later, C.L. and defendant went shooting together near Hodge Road. C.L. took Detective Reyes and a crime scene technician to the location where he went shooting with defendant. C.L. directed them to where defendant was shooting, and they recovered about 200 casings. All of the casings were the same, and had the same color and "headstamp" as the seven casings recovered at the scene of Burns's murder. All but one of the casings had been fired from a 9-millimeter. About nine or 10 guns were represented within the remaining casings, seven of which were matched to C.L.'s Hi-Point.

The seven casings found at the crime scene were determined to have been shot from the same weapon, and were consistent with having been fired from a Hi-Point .9-millimeter handgun. C.L.'s Hi-Point was ruled out. Thirteen of the casings found at the Hodge Road location were matched with the seven casings at the crime scene, and all of these casings were determined to have been fired from the same gun.

8

Shortly afterward, police executed a search warrant of defendant's residence. They found a pair of Jordans with black laces that appeared to be brand new, a Letterman-style jacket, and a pair of faded blue jeans. The police did not find any firearms in defendant's residence, nor did they ever find the murder weapon.

III.

DISCUSSION

A. *The Trial Court Did Not Prejudicially Err By Admitting the "No Way" Rap Video*

Defendant contends his conviction must be reversed because the trial court erroneously admitted his rap video into evidence. We conclude the trial court erred by admitting the video, but find that any resulting error was harmless.

1. *Additional background*

The People filed a motion in limine seeking to admit into evidence a rap music video. The video is for a song titled "No Way" by "Chop Gang," lasts just under three minutes long, and features defendant (aka Nikko Real 1) and Tracy Venable (aka Trocc) rapping. In the video, defendant can be seen wearing a blue jersey and a blue hat. Defendant also throws up hand signs and holds a gun at one point. Part of defendant's rap is as follows:

"Self-made ni--a from the desert and we dirty.

"Got some warriors that will shoot a ni--a,

"Stephen Curry.

9

"Police on my ass,

"Got a ni--a nervous.

"We on a mission, seven deep up in this 'Burban.

"Robbery and homicide is all that we knowin. . . ."

"I am the Connect, you can go check the wifi.

"Then have respect, in this status since Jr. High.

"With my ni--a Trocc and you know we got the burner,

"Let that bitch sing, shells hot like a furnace.

"With my ni--a Trocc and you know we got the burner,

"We some Westside Ni—as

"[L]ose your feelings because we will hurt em."

Defendant argued that, aside from the portion of the video showing him touching a gun, the video was not relevant and otherwise inadmissible under Evidence Code section 352. The People, on the other hand, argued it was relevant and admissible to show defendant's motive and intent. The trial court agreed, finding that the video was "highly relevant" as to defendant's intent and motive and was not unduly prejudicial. The trial court noted, however, that its ruling on the motion in limine was subject to change during trial.

The parties revisited the issue of the video's admissibility at trial. Defense counsel argued it was "pure disposition evidence" unrelated to defendant's motive or intent. Counsel also argued that the People could show the jury screenshots

10

from the video showing defendant touching the gun instead of showing the jury the entire video. The People argued the video was relevant because (1) the gun defendant touches in the video was the gun he used to shoot Burns, (2) defendant told an investigating officer that he raps about his real life with Chop Gang, and (3) the video would help establish defendant's motive and intent in that it would show that, as a gang member, it was important for defendant to take retaliatory action when disrespected, and defendant felt disrespect by Burns's stealing his PlayStation. The People also argued the video was relevant to contradict defendant's statements to the police that he rapped by himself and did not own a gun.

The trial court ruled that the video was admissible. The court reasoned that it was "powerful" in contradicting defendant's statements to the police that he was a solo rapper and did not own a gun. The court also concluded that the video was relevant to show defendant's intent and motive and was not unduly prejudicial.

After the jury saw the video and the parties were discussing jury instructions, defendant reiterated his objection to the video. The People again argued that the video was relevant to defendant's motive because it showed that gang members, such as defendant, violently retaliate when disrespected. The trial court explained that it had "strongly consider[ed]" defendant's objection, but continued to believe that the video was admissible.

2. *Applicable Law and Standard of Review*

11

"Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) Evidence "adverse to a defendant's case does not render it prejudicial within the meaning of [Evidence Code] section 352. [Citation.] In applying this statute we evaluate the 'risk of "undue" prejudice, that is, "'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,'" not the prejudice "that naturally flows from relevant, highly probative evidence."' [Citations.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.)

Because the decision to admit or exclude evidence under Evidence Code section 352 is committed to the trial court's discretion, we will not disturb a trial court's exercise of that discretion """"except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citations.]"" (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000-1001.)

### 3. *Analysis*

At the outset, we reject defendant's suggestion that the No Way video was inadmissible because there were no gang allegations and there was insufficient evidence that Chop Gang is a criminal street gang, not just a rap group. Detective Griego unequivocally testified that "Chop Gang is a criminal street gang." And as our Supreme Court has held, gang evidence may be relevant even in the absence of a gang allegation. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

That said, in cases without any gang allegations, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049.) "Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' [Citations.] Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, 'trial courts should carefully scrutinize such evidence before admitting it. [Citation.]'" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

There is limited authority about the admissibility of rap videos and rap lyrics. (See *People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*) ["Two published California cases have considered the admissibility of rap lyrics."].) The parties have

cited only two published cases, *People v. Olguin* (1994) 31 Cal.App.4th 1355 and *People v. Zepeda* (2008) 167 Cal.App.4th 25, and a third, *Coneal*, was published after the People submitted their respondent's brief and shortly before defendant's reply brief was due.

In *People v. Olguin*, *supra*, 31 Cal.App.4th 1355, "gang graffiti written by one of the defendants was crossed out and replaced with another gang's logo. [Citation.] When the two defendants went looking for the culprit, the victim yelled out the name of the other gang; one of the defendants punched him and the other shot him. [Citation.] On appeal, the defendants challenged the admission of written rap lyrics found in a search of one of their homes. [Citation.] After concluding the lyrics were 'adequately authenticated as the work of' this defendant, the Court of Appeal found the admission proper: 'they demonstrated his membership in [his gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing.' [Citation.] Because the 'crime [was] alleged to be gang related[,] [g]ang membership was obviously important, and evidence tending to show it was highly relevant.' [Citation.] Although the lyrics contained 'general threats of violence,' '[t]he mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said "substantially" to outweigh their considerable probative value.' [Citation.]" (*Coneal*, *supra*, 41 Cal.App.5th at pp. 964-965.)

In *People v. Zepeda*, *supra*, 167 Cal.App.4th 25, "the defendant shot a rival gang member and his son. [Citation.] At trial, the jury heard two tracks from a gangster rap CD that the defendant had written. [Citation.] The Court of Appeal found no abuse of

14

discretion:  'The evidence was probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it.  The songs showed that defendant's gang had the motive and intent to kill [members of the rival gang]. . . .  [¶] While lyrics and poems do not often establish their author's true state of mind [citation], the gang expert here testified that gangs communicate through music.  Defendant's communications here were not ambiguous or equivocal.  These lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards [members of the rival gang], go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities,' and 'provided noncumulative evidence of defendant's state of mind and his gang association, differing in context from his tattoos, drawings, notebooks, and pictures of himself flashing gang signs.'  [Citation.]  The court further found the tracks were not 'unduly prejudicial. . . .  The language and substance of the lyrics, although graphic, did not rise to the level of evoking an emotional bias against the defendant as an individual apart from what the facts proved.'  [Citation.]"  (*Coneal*, *supra*, 41 Cal.App.5th at p. 965.)

In *Coneal*, the appellate court held that the trial court erred by admitting rap videos featuring the defendant rapping for two reasons.  (*Coneal*, *supra*, 41 Cal.App.5th at pp. 965-970.)  First, the videos were cumulative of other evidence.  (*Id*. at p. 966.)  The dozen-plus screenshots from the videos that the People showed the jury "completely or largely captured" the probative value of the videos, which rendered the videos with "minimal" evidentiary value.  (*Ibid*.)  Second, the videos' lyrics—"the only new

15

'information' provided by the videos"—had "no probative value" and were "extremely prejudicial." (*Id*. at p. 968.) The lyrics described "graphic, widespread violence" that the People argued should be taken literally because the lyrics were about actual crimes the defendant and his gang committed or intended to commit. (*Ibid*.) The *Coneal* court held the videos should not have been admitted because there was no evidence suggesting that the lyrics depicted actual events the defendant or his gang "committed or intended to commit." (*Id*. at pp. 969-970.)

The *Coneal* court then held that the videos were unduly prejudicial. Even though a detective, the defendant, and the defendant's fellow gang member and rapper testified "that not all lyrics describe actual events, the rap videos paint a picture of [the defendant] and his fellow gang members as eagerly and ruthlessly seeking out and engaging in violence, with no empathy for their victims." (*Coneal*, *supra*, 41 Cal.App.5th at pp. 970-971.) The *Coneal* court held that, even if "this picture is accurate, it poses a significant danger that the jury will use it as evidence of [the defendant's] violent character and criminal propensity." (*Id*. at p. 971.) The court reasoned that some of the reasons the People proffered the video—to prove that defendant "'embraced the gang lifestyle'" and was a violent gang member—"skirt[ed] dangerously close to advocating the use of the videos as evidence of [the defendant's] violent character." (*Ibid*.) Finally, the videos contained misogynistic lyrics, which had "no probative value yet were highly inflammatory." (*Ibid*.) In sum, the *Coneal* court held the videos should not have been admitted because their probative value was minimal given that they were cumulative of

16

other evidence and there was no "persuasive basis to construe specific lyrics literally." (*Id.* at p. 972.)

Under *Coneal*, we conclude the trial court abused its discretion by admitting the No Way video in its entirety. The People correctly argued the video was admissible to contradict defendant's statement that he did not own a gun.[2] But this could have been accomplished by admitting the video without sound and, as defense counsel suggested, by showing the jury screenshots of the video where defendant touches a gun. Similarly, to the extent the People wanted to admit the video to show defendant's undisputed affiliation in Chop Gang, this also could have been accomplished through showing the jury screenshots from the No Way video, playing the video without sound, or witness testimony. The song's lyrics were immaterial to that purpose. Moreover, the lyrics were irrelevant to the undisputed evidence that defendant rapped with Chop Gang.

As the People explain in their respondent's brief, the People sought to introduce the No Way video for the additional reason of showing "the means and modus operandi of the charged crime" by emphasizing the allegedly literal nature of the song's lyrics. The People argue that defendant "rapped about his real life," including "lyrics espousing murder and shooting guns, while demanding 'respect' for his 'status.'" The People also claim that defendant rapped about owning a "burner" (i.e., a firearm) and being familiar

---

[2] The trial court also found the video was admissible to establish defendant lied to police about only rapping alone. This finding was based on its understanding of the evidence at the beginning of trial. However, Detective Reyes subsequently testified that defendant told him he rapped by himself as well as with Chop Gang.

17

with "'robbery and homicide,'" which "tended to show that he was an actual gun-toting gang member." In short, the People argued below—and argue again on appeal—that the No Way lyrics should be taken literally, and that the lyrics show defendant is a member of a violent gang.

We conclude the No Way video was improperly admitted for this purpose. As the *Coneal* court explained, "[o]ur Supreme Court recently reiterated its advisement that 'gang-related evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition" and that such evidence should therefore "be carefully scrutinized by trial courts."' [Citation.] This caution applies with particular force to rap songs that promote and glorify violence. Trial courts should carefully consider whether the potential for prejudice posed by these songs outweighs their probative value. In particular, where the rap lyrics are cumulative of other evidence, like screenshots, or where the probative value rests on construing the lyrics literally without a persuasive basis to do so, the probative value will often be 'substantially outweighed by [the] prejudicial effect.' [Citation.]" (*Coneal, supra*, 41 Cal.App.5th at pp. 971-972.)

"This was such a case." (*Coneal, supra*, 41 Cal.App.5th at p. 972.) The No Way video was cumulative of other evidence insofar as it was admitted to show defendant's undisputed membership in Chop Gang. The lyrics had limited, if any, probative value because there was no evidence that defendant wrote them or that they should be taken at face value. Admitting the video in its entirety and allowing the People to argue its lyrics reflect "everyday life experiences" and that they should be construed literally posed "a

18

significant danger" that the jury would impermissibly use the video as evidence of defendant's "violent character and criminal propensity." (*Id*. at p. 971.) In the absence of any persuasive reason to construe the No Way lyrics literally, we conclude the admission of the video was an abuse of discretion under Evidence Code section 352. (*Coneal*, *supra*, at p. 972.)

### 4. *Harmless error*

Even though we conclude the admission of the No Way video was error, any error resulting from its admission was harmless. "[R]eversal is required only if it is reasonably probable the defendant would have obtained a more favorable result had the evidence been excluded." (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 103.)[3]

Here, it is not reasonably probable that defendant would have obtained a more favorable result had the No Way video been excluded because the evidence of his guilt was overwhelming. First, defendant's stolen PlayStation was found on Burns's person when he was killed, which suggested a motive for the shooting, particularly given that Burns was affiliated with another gang. When asked about the PlayStation, defendant said he was no longer upset about it because he knew that R.C. had stolen it, but R.C.'s

---

[3] We reject defendant's argument that the admission of the No Way video amounted to a violation of his federal constitutional rights. "[T]he routine application of provisions of the state Evidence Code law does not implicate a defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.) "[O]nly evidentiary error amounting to a *complete preclusion* of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4, italics added.)

19

brother had paid him back. However, both R.C. and his brother denied knowing anything about the PlayStation.

Second, defendant's gun was forensically linked to the crime. Shell casings found at the crime scene matched shell casings found where defendant and C.L. went shooting together, which suggested that the casings at the crime scene came from defendant's gun.

Third, defendant was pulled over about a mile from the crime scene shortly after the shooting, and told the CHP officer that he was on his way to pick up his girlfriend. But when the police later asked about his whereabouts on the night of the crime, defendant said he was at home with his girlfriend and told the officers that he had lied to the CHP officer that he was picking up his girlfriend, and that he was actually on his way to pick up cough syrup for his grandmother. (See CALCRIM No. 362 [false or inconsistent statements can be indicative of guilt].)

Fourth, M.F. witnessed Burns's shooting and identified defendant as the shooter. Her description of what the shooter was wearing matched clothing items found in defendant's room. She also testified that he drove up to Burns in a silver Honda, which matched the description of defendant's car.

In light of this evidence, it is not reasonably probable that defendant would have received a more favorable outcome had the No Way video been excluded.

B. *The Trial Court Did Not Err By Allowing Detective Griego to Testify About Whether Chop Gang Is a Criminal Street Gang*

Defendant contends the trial court erroneously allowed Detective Griego to testify about his opinion that Chop Gang is a criminal street gang. We disagree.

1. *Additional background*

Sergeant Cortinas testified as the People's gang expert, and he briefly testified generally about gangs and their culture. When asked whether he had heard of Chop Gang, defense counsel objected, and the court held a sidebar. The trial court explained that it would sustain an objection if Sergeant Cortinas were asked about whether Chop Gang was a rap group, but indicated "if you want to have him testify that this is a gang, that's different." After concluding the sidebar, the People then asked whether Sergeant Cortinas had come into contact with Chop Gang members. Defense counsel objected, the trial court sustained the objection, and Sergeant Cortinas was excused shortly thereafter.

Detective Griego testified later in the trial. While questioned by defense counsel, he testified that he knew "several gang members" in the area and was familiar with the "PGN" gang. He believed that Burns "was claiming PGN," that is, that he was a PGN gang member.

At a sidebar before the People cross-examined Detective Griego, defense counsel argued the People should not be permitted to ask him whether Chop Gang is a criminal street gang because the People had no evidence that it was. Noting that defense counsel

21

asked Detective Griego whether PGN was a gang, the trial court stated it would allow the People to ask him whether Chop Gang was a criminal street gang.

On cross-examination, the following colloquy took place:

"[PROSECUTOR]: In addition you spoke about—on direct examination with [defense counsel]—that you identified the gangs. I believe your wording was, the gangs of the victim and the defendant; is that correct?

"[DETECTIVE GRIEGO]: That's correct.

"[PROSECUTOR]: Is Chop Gang a gang?

"[DEFENSE COUNSEL]: Objection for the reasons previously stated.

"[THE COURT]: Overruled for the reasons previously stated.

"[DETECTIVE GRIEGO]: In my opinion working in Barstow as a gang investigator and major crimes investigator, I believe Chop Gang is a criminal street gang."

2. *Analysis*

Defendant argues the trial court erred by allowing the People to ask, and Detective Griego to opine, about whether Chop Gang is a criminal street gang. We disagree.

At the outset, we reject the People's argument that defendant forfeited the argument by failing to object. During the sidebar before Detective Griego's cross-examination, defense counsel unequivocally stated that he objected to Detective Griego testifying about whether Chop Gang is a criminal street gang because, in his view, the People had no evidence that Chop Gang is such a gang. Although defense counsel did not explicitly state that his objection was due to a lack of foundation, the substance of his objection and the nature of the discussion counsel had with the trial court during the sidebar makes it clear that he was lodging a foundation objection. When defense counsel objected again "for the reasons previously stated," the trial court overruled the objection "for the reasons previously stated," which indicates that the trial court understood the basis for the objection and did not require any further input from the parties. Accordingly, defendant did not forfeit his objection to Detective Griego's testimony about whether Chop Gang is a criminal street gang.

"Evidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent," and "[t]he admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1369.) Here, Detective Griego's testimony about Chop Gang being a criminal street gang

23

was relevant to show defendant's motive and intent. There was testimony that (1) respect is crucial to gang members, (2) gang members violently retaliate when they feel disrespected, and (3) gang members believe they earn respect by violently retaliating against those who have disrespected them. Whether Chop Gang was a gang, and thus whether defendant was a gang member, was relevant to proving the People's theory that defendant retaliated against Burns for stealing his PlayStation and about $1,000. More specifically, defendant's gang membership was relevant to showing why, in the People's view, defendant responded so extremely—by killing Burns—over a stolen video game console and relatively small sum of money. We therefore conclude the trial court did not abuse its discretion in allowing Detective Griego to testify that Chop Gang is a criminal street gang.

Regardless, even if the trial court erred by admitting Detective Griego's testimony, as outlined above, there was overwhelming evidence defendant murdered Burns. Although evidence of defendant's gang membership makes Burns's murder make slightly more sense, even in the absence of any such evidence, (1) an eye witness identified defendant as the shooter, (2) defendant's gun was linked to the murder weapon, (3) Burns had defendant's stolen laptop when he was shot, which suggested a motive for the shooting, and (4) defendant gave conflicting statements about his whereabouts before, during, and after the crime. We therefore conclude that any resulting error from the admission of Detective Griego's testimony was harmless.

Because we find Detective Griego's testimony was properly admitted and not prejudicial, we reject defendant's argument that his trial counsel was ineffective for failing to move to strike his testimony. We further conclude that trial counsel was not ineffective for failing to do so because the motion would have been futile. The trial court thoroughly considered the issue and twice disagreed with defendant's objection to Detective Griego's testimony. It is highly unlikely that the trial court would have changed its mind had trial counsel objected for a third time. "Counsel is not required to proffer futile objections" to avoid an ineffective assistance of counsel claim. (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

C. *The Trial Court Did Not Err by Failing to Give a Limiting Instruction*

Defendant contends the trial court erred by failing to sua sponte give the jury a limiting instruction related to the limited purpose for which the jury could use gang evidence. We need not address the merits of this argument because we agree with the People that defendant forfeited the issue by failing to request a limiting instruction and by failing to object to the jury instructions as given. As our Supreme Court has unambiguously held, "a defendant who fails to ask the trial court to give a limiting instruction may not raise the issue on appeal." (*People v. Valdez* (2012) 55 Cal.4th 82, 149; accord, *People v. Clark* (2011) 52 Cal.4th 856, 942 ["Because defendant failed to request a limiting instruction below, he has forfeited his claim that it was error for the court not to so instruct."].)

25

Defendant alternatively argues that his trial counsel was ineffective for failing to request a limiting instruction. To prevail on an ineffective assistance of counsel (IAC) claim, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; accord, *People v. Johnson* (2015) 60 Cal.4th 966, 979-980; see *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1148.) A """reasonable probability""" is a probability sufficient to undermine confidence in the outcome of the proceeding. (*People v. Mbaabu*, *supra*, at p. 1149; *Strickland v. Washington*, *supra*, at p. 697.) The defendant bears the burden of demonstrating by a preponderance of the evidence that defense counsel's performance was deficient and it resulted in prejudice. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) If we can determine an IAC claim on the ground of lack of prejudice, we need not decide whether defense counsel's performance was deficient. (*People v. Mbaabu*, *supra*, at p. 1149; *Strickland v. Washington*, *supra*, at p. 697.)

"[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) If the record sheds no light on counsel's actions, the claim must be rejected unless no satisfactory explanation exists or counsel was asked for an explanation and failed to provide one. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) We will not find ineffective assistance of counsel

"unless there could be no conceivable reasonable for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

As for not requesting a limiting instruction, defense counsel may have had a legitimate tactical reason to do so. Defense counsel "may well not have desired the court to emphasize the [gang-related] evidence." (*People v. Freeman* (1994) 8 Cal.4th 450, 495.) Defense counsel may have reasonably concluded that asking for a limiting instruction on the gang-related evidence would have drawn more attention on it, which could have been harmful to defendant's overall defense. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 934 ["[T]he decision not to request [a limiting instruction] was a reasonable tactical choice by defense counsel to avoid directing the jury to focus on the evidence that proved the gang-related charges."].) Defense counsel therefore could have reasonably "deemed it unwise to call further attention" to the gang-related evidence by asking for a limiting instruction. (*People v. Hinton* (2006) 37 Cal.4th 839, 878.) Accordingly, we conclude defense counsel was not ineffective for failing to request a limiting instruction. Even if defense counsel was ineffective, defendant cannot show prejudice because, as previously discussed, the evidence of defendant's guilt was overwhelming. We therefore conclude defendant's IAC claim fails.

D. *Substantial Evidence Supports Defendant's Conviction*

Defendant contends substantial evidence does not support his conviction. We disagree.

To determine whether there is sufficient evidence to uphold a conviction, we review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt. (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) The conviction must be based on substantial evidence—evidence that is reasonable, credible, and of solid value. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the [trier of fact's] verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Defendant's principal argument is M.F.'s testimony was so unreliable and riddled with inconsistencies and perjury that his conviction must be reversed. He devotes a substantial portion of his opening brief outlining the alleged problems with M.F.'s testimony. But whether M.F.'s testimony was credible and accurate was for the jury to decide. (*People v. Miranda* (2016) 2 Cal.App.5th 829, 838.) Even if M.F.'s testimony was as problematic as defendant suggests, the jury was free to assign whatever weight to her testimony. (*Ibid.*)

As an eye witness, M.F.'s testimony alone provided substantial evidence to support defendant's conviction. (Evid. Code, § 411 ["the direct evidence of one witness

28

who is entitled to full credit is sufficient for proof of any fact"]; *People v. Young* (2005) 34 Cal.4th 1149, 1181 [testimony of one witness can be sufficient to sustain a conviction].) Regardless, as outlined in more detail above, there was additional evidence beyond M.F.'s testimony. There was evidence that Burns stole defendant's PlayStation, which provided a motive, particularly in light of his and defendant's gang membership. When asked about the PlayStation, defendant said R.C. stole it and his brother had resolved the dispute, which both R.C. and his brother denied. Defendant gave conflicting statements about his whereabouts at the time before, during, and shortly after the shooting. Finally, there was forensic evidence suggesting that defendant's gun was the murder weapon. All of this evidence was more than sufficient for a rational jury to conclude beyond a reasonable doubt that defendant murdered Burns.

E. *The Trial Court Did Not Improperly Instruct the Jury With CALCRIM No. 315*

The trial court instructed the jury with CALCRIM No. 315, which directed the jury to consider a number of questions to evaluate an eye witness's testimony, including "[h]ow certain was the witness when he or she made an identification?" Defendant contends this particular question violated his federal and state constitutional due process rights because it erroneously allows juries to equate an eye witness's certainty with the witness's accuracy.{AOB 131}

The People assert defendant forfeited the argument by failing to object to CALCRIM No. 315 below. Even if defendant did not forfeit the argument, we reject it on the merits because *Lemcke* confirms that the trial court's instructing the jury with

29

CALCRIM No. 315 did not violate defendant's state or federal constitutional due process rights. In *Lemcke*, our Supreme Court rejected the defendant's argument, which is identical to the argument defendant advances here, that CALCRIM No. 315's eye witness "certainty instruction violated his federal and state due process rights to a fair trial." (*Lemcke*, *supra*, 11 Cal.5th at p. 646.) Although the *Lemcke* court noted problems with the eye witness certainty instruction, the court held that the instruction "did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id*. at p. 661.)

Given *Lemcke*'s holding, we conclude the trial court did not err by instructing the jury with CALCRIM No. 315. *There Was No Cumulative Error*

Defendant asserts that even if the errors outlined above do not individually warrant reversal, their cumulative effect does. "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Here, we find error only in the admission of the No Way video, but conclude it was harmless in light of the overwhelming evidence of defendant's guilt. Because there were no other errors, much less a series of errors that warrants reversal, we reject defendant's contention that there was cumulative error. (*People v. Reed* (2018) 4 Cal.5th 989, 1018 ["Because we have found but one error—which was harmless—there is no prejudice to cumulate."].)

F.  *Senate Bill No. 620*

Defendant contends, and the People agree, that the matter should be remanded to allow the trial court to exercise its discretion under Senate Bill No. 620, which allows the trial court to exercise discretion with respect to striking firearm enhancements.  We agree.  Accordingly, we vacate the sentence and remand for resentencing.

On January 12, 2018, the trial court sentenced defendant to a term of 25 years to life for the murder, plus a term of 25 years to life for the section 12022.53, subdivision (d) firearm enhancement.

However, shortly before defendant's sentencing, the Legislature enacted Senate Bill No. 620, which became effective on January 1, 2018.  (Sen. Bill No. 620 (2017-2018 Reg. Sess.).)  This bill amended sections 12022.5 and 12022.53 to give trial courts discretion, "in the interest of justice pursuant to [s]ection 1385," to "strike or dismiss an enhancement otherwise required to be imposed" by those statutes (former § 12022.5, subd. (c), as amended by Stats. 2017, ch. 682, § 1, former § 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.)  The discretion conferred by the statute "applies to any resentencing that may occur pursuant to any other law."  (§ 12022.5, subd. (c).)

When sentencing defendant, however, the trial court believed it lacked the authority to strike the firearm enhancement.  The trial court explained that there was "really no discretion" for the court to exercise when sentencing defendant.

"Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record. [Citation.]" (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) Accordingly, when a trial court proceeds "with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing."[4] (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

Because the trial court was not aware of its discretion under Senate Bill No. 620 to strike defendant's firearm enhancement at the time of sentencing, we vacate the sentence and remand for resentencing.

G. *Fines and fees*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant argues the trial court unconstitutionally imposed various fines and fees without considering his ability to pay them. He further argues that this case should be remanded so that defendant may request a hearing on his ability to pay the fines and fees. The People do not oppose defendant's request.

---

[4] An exception to this rule, not applicable here, is when the record conclusively establishes that the trial court would not have exercised its discretion even if the court were aware of its discretion. (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1026.)

32

We need not address defendant's *Dueñas* challenge because this case is being remanded for resentencing. On remand, defendant may request a hearing on his ability to pay any fines or fees. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491 [affirming conviction and remanding for hearing on defendant's *Dueñas* challenge and ability to pay fines and fees].)

H. *Youth Offender Parole Hearing*

Defendant argues that this matter be remanded so defendant can make a record relevant to his future youth offender parole hearing. The People do not oppose defendant's request. We agree with the parties that defendant is entitled to this limited remand.

"The Legislature 'enacted sections 3051, 3046, subdivision (c), and 4801, subdivision (c), to provide a parole eligibility mechanism for juvenile offenders.' [Citation.] The Legislature intended 'to create a process by which growth and maturity of youthful offenders [could] be assessed and a meaningful opportunity for release established.' [Citation.] With some exceptions not applicable here, the Board of Parole Hearings is required to conduct youth offender parole hearings for qualifying offenders during their 15th, 20th, or 25th year of incarceration, depending on the sentence for their 'controlling offense.' [Citations.] The controlling offense is the offense or enhancement for which the court imposed the longest term of imprisonment. [Citation.] Offenders who receive a sentence of 25 years to life for their controlling offense are entitled to a youth offender parole hearing during their 25th year of incarceration. [Citation.] As

33

originally enacted in 2013, only persons under 18 at the time of their controlling offense were entitled to a youth offender parole hearing. [Citation.] But as of January 1, 2016, persons under 23 at the time of their controlling offense are entitled to a youth offender parole hearing. [Citations.]" (*People v. Costella* (2017) 11 Cal.App.5th 1, 8.)

In *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), our Supreme Court emphasized the importance of section 3051. The court explained that section 3051 requires the parole board to consider "youth-related factors, such as [the juvenile offender's] cognitive ability, character, and social and family background at the time of [his] offense," when making parole decisions. (*Franklin*, *supra*, at p. 269.) The court also noted that section 3051 "provides that '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime . . . may submit statements for review by the board.'" (*Id*. at p. 283.) The *Franklin* court further noted that "[a]ssembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Id*. at pp. 283-284.)

Defendant was 20 years old when he committed the offense, so he will be entitled to a youth offender parole hearing during the twenty-fifth year of his sentence. Although defendant's sentencing occurred long after *Franklin*, *supra*, 63 Cal.4th 261, he argues he was not afforded an adequate opportunity to make a record of information relevant to his

34

future youth offender parole hearing. The record does not indicate whether defendant had a sufficient opportunity at sentencing to make such a record. As the People correctly observe, "the record is devoid of evidence about [defendant's] characteristics and circumstances at the time of the offense that may be relevant to [defendant's] future parole hearing." Further, the trial court denied defendant's request for a sentencing continuance, and there is no indication that defendant's counsel ever requested to make a record relevant to defendant's future youth offender parole hearing. We therefore agree with the parties that a limited remand is appropriate "to permit the parties the opportunity to present evidence bearing on the factors discussed in *Franklin*." (*People v. Tran* (2018) 20 Cal.App.5th 561, 570; accord, *People v. Costella*, *supra*, 11 Cal.App.4th at p. 9 ["[A] limited remand is in order for the trial court to determine whether defendant had an adequate opportunity to make a record of information relevant to his eventual youth offender parole hearing, as required by *Franklin*."].)

IV.

DISPOSITION

The judgment of conviction is affirmed. Defendant's sentence is vacated. The matter is remanded for the trial court (1) to exercise its discretion as to whether to strike the firearm enhancement, (2) to allow defendant to request a hearing on his ability to pay the fines and fees imposed by the trial court, and (3) to give defendant a sufficient opportunity to make a record relevant to his future youth offender parole hearing. If the

trial court elects to reimpose fines, fees, or assessments, we urge the trial court to consider *Dueñas*, *supra*, 30 Cal.App.5th 1157, when doing so.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

FIELDS
J.