Filed 12/12/25  P. v. Young CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER YOUNG,<br><br>     Defendant and Appellant. | A168131<br><br>(Napa County<br>Super. Ct. No. 20CR001796) |

Defendant Christopher Young appeals a judgment entered upon a jury verdict finding him guilty of murder and other crimes.  He contends the trial court abused its discretion and deprived him of due process by admitting photographs of the victim while alive, photographs of himself holding a gun, and evidence of an uncharged incident of criminal conduct a week before the murder.  We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was convicted of killing 18-year-old Nathan Garza, who was apparently a complete stranger to him, in the parking lot of a Safeway store where Garza worked.  According to surveillance video, Garza was fatally shot just after noon on August 16, 2020 by someone in a white Cadillac that had been parked in the lot.  The theory of the defense was that defendant's friend Tyler shot and killed Garza from the passenger seat, while defendant drove

1

the car.[1]  Before examining the defense case, we set forth the prosecution's evidence.

### *Tyler's Car and Gun*

Defendant and Tyler were friends and spent a lot of time together. Tyler had recently purchased the white Cadillac used in the murder.  He never let defendant or anyone else drive the car.  Both he and defendant kept some of their belongings in the car.  Tyler also owned a Smith and Wesson .45 caliber firearm.  He kept extra ammunition in his car and had shown it to defendant.  The two of them had shot the gun together from the car windows a few days previously, and defendant had taken a video of it that showed Tyler's face and defendant's arm as they passed the gun and shot it out of the window.

### *Events at the Rental House*

On August 15, 2020, the day before the killing, Tyler had been driving with defendant in the Cadillac.  That evening, the two of them went to a Safeway store in American Canyon and ingested drugs in the parking lot. According to Tyler, neither he nor defendant had slept in "probably" a couple of days.

Later that night, Tyler and defendant went in the Cadillac to a house in American Canyon that had been rented by another friend, Latoya, and defendant smoked methamphetamine.  Also present in the house were Latoya's sister, Tawnya, and some of the sisters' children.  The evidence at trial showed that at the time of Garza's murder, all of the adults in the house regularly used methamphetamine or other drugs, and Latoya acknowledged that her memory of events was "foggy."  Nevertheless, the versions of events

---

[1] In the interest of privacy, we will refer to some of the participants in these events by their first names.  We intend no disrespect.

to which Tyler, Tawnya, and Latoya testified at trial were largely consistent with each other.

During the course of the night, Latoya saw Tyler asleep on a bed where Tawnya was also sleeping, on top of the covers. When Tawnya awoke twice during the night, she saw Tyler still sleeping next to her and defendant in the bedroom doorway. She awoke sometime around 11:30 a.m. and saw Tyler still sleeping next to her.

Tyler testified that he went to sleep shortly after arriving at the house, and his car key and the loaded gun were with him. Latoya and Tawnya were also on the bed, all fully clothed. When Tyler awoke, he saw that his keys and his gun were gone, and he made telephone calls in an unsuccessful effort to track defendant down. When Tyler told Tawnya his car was gone, Tawnya called for defendant, but he was not in the house. Tyler made multiple phone calls, and said, "he's not answering." He appeared "frantic" and upset. He went outside to look for the Cadillac. Surveillance video shows him walking down the driveway of the house at 1:05 p.m., apparently in search of the car.

Records for Tyler's cell phone showed that he made a call from the area around the rental house at 9:33 a.m.; no other calls were made until 12:25 p.m., after which the phone made multiple calls from the vicinity of the rental house, including several calls to defendant's phone between that time and 1:57 p.m. Tyler also texted someone else at 12:33 asking where defendant was. And location data on Tyler's phone showed that it was in the vicinity of the rental house between 11:57 a.m. and 12:03 p.m., the time of the murder.

Latoya arranged for a ride to Vallejo. Tyler was still present at the house; according to Tawnya, he had not left it from the time he woke up. On her way to Vallejo, Latoya saw a Safeway taped off, like a crime scene. She had been trying to get in touch with defendant, and she knew Tawnya and

3

Tyler were also looking for him and the Cadillac, so she contacted them and told them they should check to see if the crime scene had anything to do with defendant. Tawnya and Tyler went to the Safeway, and someone there told Tawnya a person had been shot.

### *Evidence of Defendant's Movements Before Killing*

An analysis of defendant's cell phone records showed that after 7:00 that morning his phone traveled south from American Canyon to Vallejo. License plate readers showed the Cadillac crossed the Carquinez Bridge at 7:53 a.m., was farther south in Hercules at 8:27 a.m., and crossed the bridge again heading north at 8:49 a.m. A Snapchat video showed defendant driving what appears to be the Cadillac at 8:52 a.m. Surveillance video showed the white Cadillac returned to the rental house at 9:34 a.m., then a person returned to the car, which left again just before 11:30 a.m. The person appeared to have somewhat dark skin and no tattoos on his forearms, was wearing a black shirt, and was carrying black and white gloves.[2] The white Cadillac was next seen in surveillance video in the parking lot of a Safeway store in American Canyon, pulling into one of the spots reserved for drive-up-and-go orders at 11:51 a.m. At 11:54, from a location near this Safeway store, defendant's phone made a call to a number associated with Safeway's drive-up-and-go service.

### *The Killing*

Garza worked at the Safeway in American Canyon and was on duty that day to handle drive-up-and-go orders. Video from inside the store showed Garza receiving a call at 11:54 a.m., the precise time defendant's cell phone records showed he made a call to Safeway's drive-up-and-go service. Garza told his supervisor he had received a call but could not understand the

---

[2] Tyler had tattoos on his forearms.

4

person on the line, aside from the name Chris or Christopher.  The supervisor checked the list of orders but did not see any in that name.  Garza said he would go outside and ask the customer for more details.

Surveillance video showed the white Cadillac was parked in the lot, and it began to back up at 11:59 a.m.  Garza came out of the store with an order of groceries for another customer, and the Cadillac pulled back into the parking space.  Garza brought the groceries to the vehicle next to the Cadillac and loaded them into the trunk.  As he walked away, the Cadillac once again pulled out of the parking space and stopped, the driver's side closest to Garza.  The video shows the Cadillac beginning to move forward as Garza walked past it, then, at approximately 12:02 p.m., Garza falling to the ground and the Cadillac speeding away.  Witnesses heard gunshots and saw smoke coming from the driver's side window.  Two bullets struck Garza's torso, one of them quickly causing his death.

A witness parked in the spot next to the white car—with the white car on the driver's side of the witness's car—testified that she thought she saw two people in the white car.  She thought the person in the passenger seat was lean and had a shaved head, and she could not tell whether the passenger was a tanned Caucasian person or a light-skinned person of color with a shaved head.  But she expressed some uncertainty as to whether there had been a person in the passenger seat at all.  She heard the sound of three or four gunshots, Garza fell to the ground, and the white car sped away toward the highway.  Another witness provided a partial license plate number for the car that corresponded to that of Tyler's Cadillac.

### Events After the Killing

About two minutes after the shooting, the Cadillac parked in front of a house in American Canyon.  Video from a nearby security camera showed

5

only one person, a light-skinned African American man with a full head of hair and wearing a red shirt, leaving the car and walking away from it. The man, identified as defendant, ran through yards in the residential area, jumping over fences, before he was apprehended. He provided a false name and date of birth when he was detained. Defendant's blood was tested, and it was positive for methamphetamine.

When the Cadillac was later searched, its contents included a backpack containing clothing, a .45 caliber Smith and Wesson firearm and ammunition, and black and white gloves. The firearm was later identified as the weapon that shot the bullets that killed Garza. There were handprints on the weapon; Tyler was excluded as the source of the prints, but defendant could not be excluded, and defendant's fingerprints matched those found on an ammunition magazine found in the car. DNA consistent with defendant's was found in the interior driver door handle, the steering wheel, a black and white glove found in the car, and the handle of the backpack. Gunshot residue was found inside the car, as well as on black and white gloves and a black shirt found in the car, items consistent with what the suspect was wearing in a surveillance video at the rental house before the killing. Clothing collected from Tyler the same day showed a few characteristic particles of gunshot residue, and a few more particles that are "consistent with" gunshot residue, meaning they are not "the more unique type of particles," but are sometimes seen in residue.

In recorded calls from jail in the ensuing days, defendant told a friend, Cinthia, that the car had been stolen from the rental house, that Tyler was not driving it, and that defendant was running through yards in an effort to get a bike so he could find the car. He told a similar story to another friend. In a call a few weeks after the killing, he acknowledged to Cinthia that

6

surveillance video showed him getting out of the car after the murder, and he said he did not know how he was going to "fight that." Defendant made other incriminating statements in recorded calls, among them telling Cinthia that someone, apparently his attorney, was trying to have the video from Safeway enhanced "because as of right now, you can't see [anything]. And I was like, 'Why are you trying to enhance the video if . . . you can't see anything?' That's a good thing." He also told her it was "better" that the video did not show the shooter clearly.

### The Defense Theory

The theory of the defense was that Tyler was in the car with defendant and that he, not defendant, shot Garza by suddenly leaning over from the passenger side to shoot from the driver's-side window.

A woman who lived next door to the rental house testified that on the day of the shooting she saw a young white man with short hair walking toward the rental house, and that he was later arrested. She initially testified this happened around lunchtime or around noon, but on cross-examination she acknowledged that all she remembered was that it was before 1:00 or 2:00 in the afternoon.[3] A man who also lived next door testified that around 11:30 or 11:45 on the day of the shooting, he saw a white Cadillac park in the driveway of the rental house, then it pulled out and drove off shortly afterward. He vaguely remembered it was driven by "a white guy," with an African American man sitting in the passenger seat. The man acknowledged, however, that he had been interviewed four or five times by the defense and they had kept asking him leading questions. And his

---

[3] After Tyler reported his car stolen, police officers came to the rental house and arrested him, apparently because of an outstanding warrant for his arrest.

testimony was undercut by other evidence:  He told the police the day of the shooting that he had left at 10:30 or 11:00 that morning, that he had not seen a white guy associated with the rental house, and that he never saw anyone driving the Cadillac.  And surveillance video showed this witness's truck left the property at 11:03 a.m. and did not return until 5:39 p.m. the day of the killing.  Video also showed the Cadillac leaving the rental house at 11:24 a.m.—after the witness's truck drove away—Tyler coming down the driveway apparently in search of his car at 1:05 p.m., Latoya leaving at 1:42 p.m., and Tawnya and Tyler leaving together at approximately 1:52 p.m.

As we have already noted, the Safeway customer who was parked next to the Cadillac thought she saw someone in the passenger seat.  She was asked to view pictures of various people the evening of the killing.  She thought one person depicted, who appears from the photograph to be white, was "maybe" someone she had seen in the Cadillac; underneath the picture, she wrote, "If it was this person his hair was definitely shaved when I saw him.  I'm not sure it was him."  The person she identified was Tyler, and the picture—apparently Tyler's booking photograph—showed he was a young white man with dark hair.

Other eyewitnesses saw only one person in the white Cadillac.  Two people who worked at the Safeway gas station heard gunshots, saw a white car speeding away, and saw only a single person in the car, a male who appeared either Mexican or mixed-race.  According to one of them, the driver's side window was down, and the driver was wearing a black shirt.  Neither witness was able to identify defendant as the driver.

### Verdict and Sentence

The jury found defendant guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1), and in connection with this count

8

found true allegations that he personally and intentionally discharged a firearm, causing death (Pen. Code, § 12022.53, subd. (d)), and that he killed the victim by lying in wait and by intentionally firing from a motor vehicle with the intent to kill, both special circumstances (Pen. Code, § 190.2, subd. (a)(15) & (21)).  It also found him guilty of shooting from a motor vehicle (Pen. Code, § 26100, subd. (d); count 2), with an enhancement that he personally and intentionally discharged a firearm, causing death (Pen. Code, § 12022.53, subd. (d)); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 3); unlawful possession of ammunition (Pen. Code, § 30305, subd. (a); count 4); and giving false information to a police officer (Pen. Code, § 148.9, subd. (a); count 5).  The trial court found true a number of special allegations and factors in aggravation.  (Pen. Code, §§ 1203, subd. (k), 12022.1; Cal. Rules of Court, rule 4.421.)

The trial court sentenced defendant to life without the possibility of parole for count 1, with an additional 25 years to life consecutive for the firearm enhancement (Pen. Code, § 12022.53, subd. (d)); imposed and stayed the aggravated term of three years for count 2, with an additional 25 years to life for the firearm enhancement; and imposed a consecutive term of three years for count 3, a consecutive eight months (one-third the midterm) for count 4, and a concurrent 180 days for count 5, with credit for 180 days.  The court also imposed and stayed an additional two years for an out-on-bail enhancement.  (Pen. Code, § 12022.1.)  This timely appeal ensued.

## DISCUSSION

### I.    Photographs of Victim While Alive

At trial, the jury viewed four pictures of Garza while he was still alive: two of him outdoors, smiling, one of him with a fish he had caught, and one with his parents after his high school graduation.  Defendant contends the

9

trial court abused its discretion and deprived him of his due process rights by admitting these exhibits.

### *Additional Background*

Before trial, both the People and defendant made motions in limine. One of the People's motions was for introduction of photographs of Garza while alive, as well as crime scene and coroner photographs. The photographs of Garza while alive, the People argued, were relevant to establish the victim's identity, and the pictures of him after death further established identity and showed the bullet entry points. Defendant moved that no photographs or other evidence "describing or depicting emotionally upsetting or otherwise prejudicial images be presented to the jury." (Boldface and underlining omitted.) This motion was based on the theory that the trial court has discretion to exclude victim photographs that are "unduly gruesome or inflammatory," such as gory autopsy photographs, and defendant argued that since he did not dispute the cause of death, the medical evidence should be presented without referring to autopsy photographs that would amount to an appeal to the jury's emotions.

When the court and the parties were discussing these motions, the court asked the prosecutor how many photographs she had in mind, and she replied that she would use only two or three images of Garza while alive, "[a]nd then for the victim after death, it's not only photographs that we need for purposes of testimony by our coroner, . . . at autopsy, but we also have some photographs at the scene that we need to introduce." Defense counsel said, "As the court knows, I'm objecting to that. Cause of death is not an issue." The prosecutor argued that she was entitled to prove how Garza died and the number of injuries he sustained, and defense counsel reiterated that there was no dispute about the cause of death, that the coroner could explain

his findings to the jury, and that showing the jury "these photographs" would be prejudicial, then said, "Submitted." The court asked what type of photos of Garza while alive would be presented, and the prosecutor repeated that she would use two or three adult photos. The court said it would allow two or three pictures when Garza was alive but would reserve ruling on the autopsy pictures; the court indicated, however, that it intended to allow some of the autopsy pictures in over defendant's objection. Defense counsel pointed out that there were a number of photos and that he had not yet seen the photos the prosecutor sought to introduce, and the court answered, "And you reserve the right to object."

During her opening statement, the prosecutor displayed a graduation photo of Garza, telling the jury that she did so "because we are not going to be talking about Nathan for a large part of this case. And Nathan should not be forgotten." She went on to tell the jury that Garza loved his friends, his family, and his girlfriend, that he loved baseball and fishing, and that he had a "summer job [that] cost him his life." Defendant made no objection either to the argument or to the display of the photograph. The People's first witness was Garza's mother, who described her son in moving terms. While questioning her, the prosecutor asked the court to admit the four photographs of Garza while alive that we have described. The trial court asked defense counsel if he had any objection to their admission, and he replied, "No." The photographs were then admitted.

At the outset of her closing argument—apparently without displaying any photographs—the prosecutor again pointed to Garza's humanity, saying he was full of life and promise, loved his family and friends, loved fishing and baseball, had just graduated high school, and was about to start college. Defendant interposed no objection.

11

*Analysis*

The Attorney General contends defendant forfeited his challenge to admission of the photographs of Garza while alive by failing to raise an objection at trial. This point is well taken. In general, a party may not complain on appeal about erroneous admission of evidence unless a timely objection on the same ground was made in the trial court. (*People v. Boyette* (2002) 29 Cal.4th 381, 423–424 (*Boyette*) [defendant forfeited objection to photographs by failure to raise timely objection]; see *People v. Delgado* (2017) 2 Cal.5th 544, 580–581; Evid. Code, § 353, subd. (a).) Defendant argues that his motion in limine seeking to bar "emotionally upsetting or otherwise prejudicial images" is broad enough to encompass pictures of Garza while he was alive. (Boldface and underlining omitted.) In our view, that stretches defendant's motion past the breaking point. The motion makes no mention of images of Garza while alive, but instead focuses its attention on "gruesome or inflammatory" and "gory" images such as autopsy photographs. Similarly, defendant's arguments at the hearing on the motions in limine were directed entirely to the post-death photographs. At no point did defendant argue that images of Garza while alive would be unduly prejudicial. And, although the trial court established that defendant reserved his right to object to photographs and expressly gave him the chance to object before admitting into evidence the photographs of Garza while alive, defense counsel told the court he had no objection. We are satisfied that defendant forfeited his challenge to the photographs.

Challenging this conclusion, defendant argues the trial court had allowed him to reserve the right to object only to the images of Garza after his death and that it would have been futile to raise a new objection to pictures of him while alive. (See *People v. Carrillo* (2004) 119 Cal.App.4th 94,

101 [duty to object excused when objection would have been futile].) We see no reason to interpret so narrowly the court's statement that defendant reserved his right to object, but regardless, the court then asked defendant immediately before admitting the four photographs whether he had any objection, and defendant expressly said that he did not. In these circumstances, the rule of forfeiture bars defendant's claim.

Even if defendant had preserved this claim, we would reject it for failure to prove prejudice. He argues the four photographs were substantially more prejudicial than probative (Evid. Code, § 352) because there was no dispute that Garza was the person killed and because the images would elicit an emotional reaction against defendant by underscoring the horrific nature of the loss of Garza's life. (See *People v. Winn* (2020) 44 Cal.App.5th 859, 867 [trial court should "carefully consider the actual relevance of photos of murder victims while alive" to avoid risk they will " 'merely generate sympathy for the victims' "].) Our high court has cautioned against admission of images of murder victims while alive if unnecessary to prove a disputed point. (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1230; *Boyette*, *supra*, 29 Cal.4th at p. 424; *People v. Poggi* (1988) 45 Cal.3d 306, 323.) But even if the photographs were not relevant to any question in dispute, we see no possible prejudice here. The photographs were shown to the jury at the outset of a six-week-long trial, during which the jury heard testimony from, by our count, more than 80 witnesses and viewed many exhibits, among them, video showing the moment of the shooting. The evidence that defendant was driving the Cadillac at the time of the killing and that Tyler was at the rental house at that time was strong, and the evidence that Tyler was in the car was tenuous at best and contradicted by surveillance video and cell phone evidence. That evidence included videos showing only one person

13

in the area of the Cadillac before it left the rental house at 11:24 a.m.; defendant emerging alone from the vehicle a few minutes after the killing; location data showing Tyler's cell phone was at the rental house at the time of the killing; Tyler making phone calls, including attempted calls to defendant, from the vicinity of the rental house beginning at 12:25; and Tyler walking around outside the rental house at 1:05, times that are consistent with the testimony of himself, Tawnya, and Latoya that he was "frantic" when he learned his new car and defendant were missing and that he made multiple phone calls. The evidence also included recordings of defendant's jail phone calls when, for instance, he said he did not want his attorney to enhance the Safeway surveillance videos and he initially told his friends that Tyler's car had been stolen and defendant ran through back yards looking for a bike so he could search for the Cadillac—a story that was inconsistent not only with the evidence but also with defendant's position at trial. We see no cause for concern that the photographs the jury saw more than a month previously distracted it from its duty to consider the evidence impartially. Nor do we see any possibility that the jury would have reached any other conclusion had it not seen the photos. (See *Winn*, at p. 867 [no prejudice in admission of photo of victim because of strength of evidence against defendant].)

## II.    Earlier Incident at a Safeway Store

The trial court allowed the prosecutor to introduce evidence of an incident defendant was involved in at a different Safeway store a week before the crime at issue here. Defendant contends the trial court abused its discretion and deprived him of due process by admitting this evidence.

14

### Additional Background

Before trial, the People moved to introduce evidence of an incident that took place a week before the killing of Garza at a different Safeway store, in which defendant, Tyler's brother, and the brother's girlfriend were arrested after a Safeway employee reported to the police that one of them was carrying a gun. The motion argued the evidence was admissible to show defendant's motive in killing Garza—that is, retaliation for the cashier at the other store " 'snitching' " to the police—as well as to show malice. Over defendant's objection, the trial court allowed the evidence.

The jury heard evidence that on August 9, 2020, a week before Garza was killed, defendant was in a Safeway store in Cordelia. He tried to purchase gift cards worth more than $250 with multiple credit cards, but the transactions were declined. The cashier told defendant to wait, got his manager, then clocked out and went outside to the parking lot to wait for his father, who also worked at the store. While waiting, the cashier saw a car park in the lot, a white man get out of the passenger's seat and put on a backpack, and the grip of a handgun at the man's waist. The man went into the store, and soon afterward the driver, who was a woman, also entered the store. The cashier called 911.

Police officers arrived and handcuffed defendant, the passenger, and the driver. The cashier recognized all three people from previous encounters in which they had been suspected of shoplifting.

All three were detained and searched, and defendant was found to have MDMA, or Ecstasy, in one of his pockets and a phone charger that he admitted he had stolen from the store. The man with the gun initially identified himself to a police officer with Tyler's name, but the officer later learned he was Jordan, Tyler's brother. Jordan had a loaded gun on his

15

person.  An officer told him that someone from the store had reported he had a gun.  Samantha, the woman with them (apparently Jordan's girlfriend), had heroin in her possession.  Defendant was arrested, cited, and released because possession of MDMA was only a misdemeanor, and the others were taken to jail.

Officers spoke with the cashier as he waited in the parking lot; the three suspects were still at the scene.

Defendant later discussed the incident with Tyler; both were upset about the events.

The trial court instructed the jury that it could consider the evidence of another offense only if the People proved by a preponderance of the evidence that defendant committed it, and only for the limited purpose of deciding whether he had a motive to commit the charged offense.

*Analysis*

As a general rule, evidence of specific instances of a person's conduct may not be used to prove his or her conduct on a specific occasion.  (Evid. Code, § 1101, subd. (a).)  Such evidence may, however, be admitted "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act."  (Evid. Code, § 1101, subd. (b).)  To be admissible for these purposes, the evidence must be relevant to a material fact in issue, must have a tendency to prove that fact, and must not violate other rules of admissibility, including Evidence Code section 352.  (*People v. Malone* (1988) 47 Cal.3d 1, 18.)  Under that provision, " 'the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 275

16

(*Garcia*); Evid. Code, § 352.)  We do not disturb that exercise of discretion unless it was made " ' "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ibid*.)  Although evidence of a prior offense is "inherently prejudicial," it must be excluded under Evidence Code section 352 only if the prejudicial effect *substantially* outweighs the probative value, that is, only if " 'it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*).)  And because motive provides an incentive for criminal conduct, " ' "its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*Garcia*, at p. 275.)

In some circumstances, the prior act must be similar to the charged offense, as when the prosecution uses the prior act to show identity.  (*People v. Cage* (2015) 62 Cal.4th 256, 273 (*Cage*) [charged and uncharged offenses must " ' " " 'share distinctive common marks' " ' " ].)  Less similarity is needed to show intent.  (*Id*. at pp. 273–274.)  And where evidence of prior bad conduct is offered to show motive, "the other crimes or conduct evidence may be dissimilar to the charged offenses provided there is a direct relationship or nexus between it and the current alleged crimes."  (*Id*. at p. 274; accord, *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018.)

Defendant contends admission of the evidence of the August 9 incident at the Cordelia Safeway store violates these principles because the connection between that incident and the murder of Garza is too speculative to support a conclusion that the August 9 incident provided a motive.  He argues that the cashier who called the police on August 9 was not wearing clothing that identified him as a Safeway employee and that he was in a car when police led defendant out of the store, so defendant had no reason to connect his

17

citation with the Cordelia Safeway store, let alone the *different* Safeway store where Garza worked. And, he points out, in a jail phone call on July 25, 2021, when defendant briefly mentioned that Jordan had gone to jail in Cordelia for possessing a gun, he expressed no animosity toward anyone over the incident.

While these factors could provide fodder for argument to the jury, we are not persuaded they negate the possibility of an inference that defendant held a grudge against Safeway. There was evidence that defendant was out of custody on bail and that his actions on August 9 violated his bail contract—which barred him from committing any further offenses and required him to abide by all laws—thus putting him at risk of forfeiture of the bond and resulting incarceration. There is also evidence that defendant and Tyler spent time smoking drugs in the parking lot of the American Canyon Safeway the evening before the killing, showing their familiarity with that store, and that defendant was under the influence of methamphetamine and had not slept when he shot and killed Garza, supporting an inference that his thinking might not have been a model of clarity. The killing of Garza was, on its face, a senseless act, and the trial court was within its discretion to admit evidence of defendant's detention— and potential loss of liberty—after committing a crime at a nearby Safeway store as a possible motive for killing a Safeway employee a week later. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 668 [evidence of prior crime admissible to show defendant shot deputies to avoid being apprehended and returned to prison for illegally possessing firearms]; *People v. Daniels* (1991) 52 Cal.3d 815, 856–858 [evidence of earlier robbery committed by defendant, in which he was injured during exchange of gunfire with police, admissible to show he later killed officers in revenge].)

18

Nor are we persuaded the trial court abused its discretion in concluding any prejudicial effect of the evidence did not outweigh its probative value. The jury was instructed it could consider the evidence of another offense only for the limited purpose of deciding whether defendant had a motive to commit the charged offense, and we presume it followed the court's instruction. (See *People v. Holt* (1997) 15 Cal.4th 619, 662; *People v. Arjon* (2004) 119 Cal.App.4th 185, 194.) The events of August 9 were not particularly shocking, especially in light of other evidence that defendant and everyone else in the house the night before the killing used illegal drugs regularly, and that both defendant and Tyler were convicted felons. The August 9 incident merely showed that defendant was in possession of drugs and appears to have engaged in shoplifting and attempted fraudulent purchase of gift cards. These facts pale in comparison to the horror of the crime with which defendant was charged, and the trial court could reasonably conclude that the potential for prejudice did not outweigh the evidence's probative value. (See *Tran*, *supra*, 51 Cal.4th at p. 1047 [potential for prejudice decreased when evidence of uncharged acts is "no stronger or more inflammatory" than evidence of charged offense].) Nor do we see any cause for concern that the jury might have been inclined to convict defendant of first degree murder out of concern that he might not have been punished for the far less serious incident of potential theft and drug possession. (See *ibid*.)

Defendant also contends admission of the evidence deprived him of his federal due process rights by rendering the trial fundamentally unfair. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 [admission of evidence, even if erroneous, violates due process "only if it makes the trial *fundamentally unfair*"]; *Estelle v. McGuire* (1991) 502 U.S. 62, 75 [concluding challenged

19

evidence did not " 'so infuse[] the trial with unfairness as to deny due process of law' "].) Admission of evidence does not violate due process unless " 'there are no permissible inferences the jury may draw from the evidence.' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 (*Albarran*); accord, *Garcia, supra*, 168 Cal.App.4th at p. 275; *People v. Casillas* (2021) 65 Cal.App.5th 135, 152.) And " '[e]ven then, the evidence must "be of such quality as necessarily prevents a fair trial." ' " (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.) " 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' " (*Albarran*, at pp. 229–230.)

Defendant has not made this showing. As we have explained, there is a permissible inference the jury could reasonably draw from the evidence—that defendant held a grudge against Safeway and sought revenge because the August 9 incident put his freedom at risk. We therefore reject his contention that admission of the evidence deprived him of his due process rights. (*Garcia, supra*, 168 Cal.App.4th at p. 275.)

## III.  Photographs of Defendant with Guns

Over defendant's objection, the trial court admitted two photographs of defendant holding guns. Defendant contends admission of these photographs was an abuse of discretion and deprived him of a fair trial.

One of two photographs, exhibit 393, depicted defendant, apparently seated in a car, looking directly at the camera and holding a handgun that was also pointed to the camera. The other, exhibit 400, is dated May 15, 2018 and shows defendant with a smile on his face, his tongue a fluorescent pink, holding a handgun pointed upward. There is no indication that either gun was the murder weapon.

During trial, the prosecutor sought to introduce these photographs, along with others dating back to 2017, to show defendant's familiarity with guns. Defendant objected, citing sections 1101, subdivision (a) and 352 of the Evidence Code. A few days later, the issue was discussed again, and defendant again asked that the photographs be excluded. Defense counsel went on to ask, however, that if the trial court saw fit to admit one or two photographs, it limit them to photographs taken shortly before the crime. Counsel continued, in a reference to exhibit 393, "There is a photo with him holding a firearm in a car that's dated August 10th of this year, so I'll submit on that," and asked the court to exclude the remaining photos.[4] The trial court admitted the two photographs described above, concluding they showed defendant was familiar with guns, a fact relevant to the offense of shooting from a motor vehicle, and that they were relevant to the knowledge element of the charges for possession of a firearm and ammunition by a prohibited person. And, the court stated, defendant's knowledge of guns was relevant because the person who killed Garza was "probably a pretty good shot," as only one bullet missed the victim.

Exhibit 400 was shown to the jury during testimony, and near the beginning of her closing argument, the prosecutor showed both exhibits to the jury while arguing that one of the "truth[s]" of the case was that defendant

---

[4] The Attorney General contends that by "submit[ting]," defendant withdrew his objection to exhibit 393. This contention is meritless. The record shows clearly that defendant objected to all photographs of himself with guns, and suggested limiting the photos to only the most recent as a fallback. We do not read this fallback argument as an abandonment of his more general objection.

21

was the shooter and telling the jury that defendant "wants you to walk him right out that door."[5]

Defendant contends that the photographs were impermissibly inflammatory and that they were unnecessary to show his familiarity with guns, a fact already established by the recording of him shooting a gun out of the Cadillac's window with Tyler. And, he argues, there was nothing distinctive enough in the manner of killing to make the photos relevant to his identity. (See *Cage, supra*, 62 Cal.4th at p. 273 [to show identity, prior act and charged offense must " ' " 'share distinctive common marks' " ' "].)

We agree with defendant that the photographs had only a limited role in showing he was familiar with guns and supporting an inference that he was a good enough marksman to hit Garza's torso from a moving vehicle. But that is partly because the jury *also* saw a video of both Tyler and defendant shooting the murder weapon out of the window of the Cadillac and laughing a few days before the murder. And in any case, the photographs are not particularly shocking. The trial court could reasonably find that they were relevant to a material issue and that any prejudicial effect did not substantially outweigh their probative value. (See *Tran, supra*, 51 Cal.4th at p. 1047.)

We are not persuaded otherwise by defendant's reliance on *People v. Archer* (2000) 82 Cal.App.4th 1380. The defendant there was convicted of murder, with a finding that he used a knife in committing the crime. (*Id.* at pp. 1383–1384.) The trial court admitted evidence of videotapes, books, and catalogs seized from his home and storage locker. They included a book with

---

[5] The parties do not direct our attention to any other point at which the jury was shown exhibit 393, and the record reflects some ambiguity as to when it was actually entered into evidence.

a chapter entitled " 'Knife Attack' "; catalogs in which certain advertised items, including videotapes related to knife fighting and articles and books related to knife fighting and killing, had been marked; catalogs from which weapons, including knives, could be ordered; and an instructional video on how to manufacture silencers. (*Id*. at p. 1393.) The appellate court concluded admission of this material was error: although some of it dealt with the purchase or use of knives, other items had no relevance to the issues at trial, and there was no indication that the knife used in the murder was unusual enough that it might have been ordered from a specialized catalog. (*Id*. at p. 1394.) The *Archer* court concluded, given the volume and "inflammatory nature" of the material, that there was a serious possibility of prejudice that outweighed the "very limited probative value" of the books and videotapes. (*Ibid*.) The court also concluded that multiple errors at trial—not only admission of the weapons evidence but also the erroneous admission of a codefendant's extrajudicial statement and the erroneous exclusion of evidence impeaching a witness who provided some of the strongest evidence of guilt— were prejudicial and required reversal. (*Id*. at pp. 1394–1397.)

No similar facts exist here. Although the challenged photographs may have limited probative value, they also do not have the shock value of the materials in *Archer*. This is especially true to the extent they are cumulative of other evidence that defendant enjoyed guns. Under the circumstances, we are not persuaded the trial court abused its discretion in admitting the photographs.

Defendant also contends admission of the photographs deprived him of his federal constitutional right to due process. But, as we have explained, admission of evidence, even if erroneous, violates due process only if " 'there are no permissible inferences the jury may draw from the evidence.' "

(*Albarran, supra*, 149 Cal.App.4th at p. 229.) The photographs provide some—albeit not overwhelming—evidence to support an inference that defendant was familiar enough with firearms that he could hit a target from a moving vehicle. And, in any case, the pictures were not shocking, the jury already had evidence that defendant and Tyler had shot the murder weapon from the car a few days beforehand, and there was strong evidence that defendant was driving the Cadillac alone the day of the killing. We see no possibility that admission of the photographs inflamed the jury against defendant or caused it to reject his defense that Tyler was the true culprit.

At oral argument before this court, defendant's counsel emphasized that the prosecutor showed the photographs of him with guns to the jury during her closing statement, shortly after noting that Garza was a young man full of life and promise and while telling the jury that defendant wanted it to "walk him right out that door." But defendant made no objection to this argument, and we are not persuaded it undermines the propriety of the trial court's ruling based on the parties' arguments about the admissibility of the photographs.

Finally, defendant argues the errors he asserts, even if individually not prejudicial, caused cumulative prejudice. We have not found multiple errors, and even if we had found all the challenged rulings improper, we are not persuaded that they cumulatively caused prejudice in light of the evidence as a whole, as discussed above.[6]

## DISPOSITION

The judgment is affirmed.

---

[6] In his opening brief, defendant also contends the trial court committed sentencing error, but he abandons this argument in his reply brief, and we do not consider it.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Young* (A168131)